(Slip Opinion)               OCTOBER TERM, 2008               1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## COEUR ALASKA, INC. *v.* SOUTHEAST ALASKA CONSERVATION COUNCIL ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 07–984.   Argued January 12, 2009—Decided June 22, 2009*

In reviving a closed Alaska gold mine using a "froth flotation" technique, petitioner Coeur Alaska, Inc., plans to dispose of the resulting waste material, a rock and water mixture called "slurry," by pumping it into a nearby lake and then discharging purified lake water into a downstream creek.  The Clean Water Act (CWA), *inter alia,* classifies crushed rock as a "pollutant," §352(6); forbids its discharge "[e]xcept as in compliance" with the Act, §301(a); empowers the Army Corps of Engineers (Corps) to "issue permits . . . for the discharge of . . . fill material," §404(a); and authorizes the Environmental Protection Agency (EPA) to "issue a permit for the discharge of any pollutant," "[e]xcept as provided in [§404]," §402(a).  The Corps and the EPA together define "fill material" as any "material [that] has the effect of . . . [c]hanging the bottom elevation" of water, including "slurry . . . or similar mining-related materials."  40 CFR §232.2.  Coeur Alaska obtained a §404 permit for the slurry discharge from the Corps and a §402 permit for the lake water discharge from the EPA.

Respondent environmental groups (collectively, SEACC) sued the Corps and several of its officials under the Administrative Procedure Act, arguing that the CWA §404 permit was not "in accordance with law," 5 U. S. C. §706(2)(A), because (1) Coeur Alaska should have sought a CWA §402 permit from the EPA instead, just as it did for the lake water discharge; and (2) the slurry discharge would violate the "new source performance standard" the EPA had promulgated under CWA §306(b), forbidding froth-flotation gold mines to dis-

——————
*Together with No. 07–990, *Alaska* v. *Southeast Alaska Conservation Council et al.,* also on certiorari to the same court.

charge "process wastewater," which includes solid wastes, 40 CFR §440.104(b)(1). Coeur Alaska and petitioner Alaska intervened as defendants. The District Court granted the defendants summary judgment, but the Ninth Circuit reversed, holding that the proposed slurry discharge would violate the EPA's performance standard and §306(e).

*Held:*

1. The Corps, not the EPA, has authority to permit the slurry discharge. Pp. 9–13.

(a) By specifying that, "[e]xcept as provided in . . . [§404,]" the EPA "may . . . issue permit[s] for the discharge of any pollutant," §402(a) forbids the EPA to issue permits for fill materials falling under the Corps' §404 authority. Even if there were ambiguity on this point, it would be resolved by the EPA's own regulation providing that "[d]ischarges of . . . fill material . . . which are regulated under section 404" "do not require [EPA §402] permits." 40 CFR §122.3. The agencies have interpreted this regulation to essentially restate §402's text, *ibid.,* and the EPA has confirmed that reading before this Court. Because it is not "plainly erroneous or inconsistent with the regulation," the Court accepts the EPA's interpretation as correct. *Auer* v. *Robbins*, 519 U. S. 452, 461. Thus, the question whether the EPA is the proper agency to regulate the slurry discharge depends on whether the Corps has authority to do so. If so, the EPA may not regulate. Pp. 9–11.

(b) Because §404(a) empowers the Corps to "issue permits . . . for the discharge of . . . fill material," and the agencies' joint regulation defines "fill material" to include "slurry . . . or similar mining-related materials" having the "effect of . . . [c]hanging the bottom elevation" of water, 40 CFR §232.2, the slurry Coeur Alaska wishes to discharge into the lake falls well within the Corps' §404 permitting authority, rather than the EPA's §402 authority. The CWA gives no indication that Congress intended to burden industry with the confusing division of permitting authority that SEACC's contrary reading would create. Pp. 11–13.

2. The Corps acted in accordance with law in issuing the slurry discharge permit to Coeur Alaska. Pp. 13–28.

(a) The CWA alone does not resolve these cases. Pp. 14–18.

(i) SEACC contends that because the EPA's performance standard forbids even minute solid waste discharges, 40 CFR §440.104(b)(1), it also forbids Coeur Alaska's slurry discharge, 30% of which is solid waste, into the lake. Thus, says SEACC, the slurry discharge is "unlawful" under CWA §306(e), which prohibits "any owner . . . of any new source to operate such source in violation of any standard of performance applicable to such source." Pp. 14–16.

(ii) Petitioners and the federal agencies counter that CWA §404 grants the Corps authority to determine whether to issue a permit allowing the slurry discharge without regard to the EPA's new source performance standard or §306(e)'s prohibition. Pp. 16–18.

(iii) The CWA is ambiguous on the question whether §306 applies to discharges of fill material regulated under §404. On the one hand, §306 provides that a discharge that violates an EPA new source performance standard is "unlawful"—without an exception for fill material. On the other hand, §404 grants the Corps blanket authority to permit the discharge of fill material—without mentioning §306. This tension indicates that Congress has not "directly spoken" to the "precise question" at issue. *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 842. P. 18.

(b) Although the agencies' regulations construing the CWA are entitled to deference if they resolve the statutory ambiguity in a reasonable manner, see *Chevron, supra,* at 842, the regulations bearing on §§306 and 404, like the CWA itself, do not do so. For example, each of the two principal regulations seems to stand on its own without reference to the other. The EPA's performance standard contains no exception for fill material, and it forbids any discharge of "process wastewater," including solid wastes. 40 CFR §440.104(b)(1). The agencies' joint regulation defining fill material includes "slurry or . . . similar mining-related materials," §232.2, but contains no exception for slurry regulated by an EPA performance standard. Additional regulations noted by the parties offer no basis for reconciliation. Pp. 18–20.

(c) In light of the ambiguities in the CWA and the pertinent regulations, the Court turns to the agencies' subsequent interpretation of those regulations. *Auer, supra,* at 461. The question at issue is addressed and resolved in a reasonable and coherent way by the two agencies' practice and policy, as recited in the EPA's internal "Regas Memorandum" (Memorandum), which explains that the performance standard applies only to the discharge of water from the lake into the downstream creek, and not to the initial discharge of slurry into the lake. Though the Memorandum is not subject to sufficiently formal procedures to merit full *Chevron* deference, the Court defers to it because it is not "plainly erroneous or inconsistent with the regulation[s]," *Auer, supra*, at 461. Five factors inform that conclusion: The Memorandum (1) confines its own scope to closed bodies of water like the lake here, thereby preserving a role for the performance standards; (2) guards against the possibility of evasion of those standards; (3) employs the Corps' expertise in evaluating the effects of fill material on the aquatic environment; (4) does not allow toxic compounds to be discharged into navigable waters; and (5) reconciles §§306, 402,

and 404, and the regulations implementing them, better than any of the parties' alternatives. The Court agrees with the parties that a two-permit regime is contrary to the statute and regulations. Pp. 20–23.

(d) The Court rejects SEACC's contention that the Regas Memorandum is not entitled to deference because it contradicts the agencies' published statements and prior practice. Though SEACC cites three such statements, its arguments are not convincing. Pp. 23–28.

(i) Although a 1986 memorandum of agreement (MOA) between the EPA and the Corps seeking to reconcile their then-differing "fill material" definitions suggests, as SEACC asserts, that §402 will "normally" apply to discharges of "suspended"—*i.e.,* solid—pollutants, that statement is not contrary to the Regas Memorandum, which acknowledges that the EPA retains authority under §402 to regulate the discharge of suspended solids from the lake into downstream waters. The MOA does not address the question presented by these cases, and answered by the Regas Memorandum, and is, in fact, consistent with the agencies' determination that the Corps regulates all discharges of fill material and that §306 does not apply to these discharges. Pp. 23–25.

(ii) Despite SEACC's assertion that the fill regulation's preamble demonstrates that the fill rule was not intended to displace the pre-existing froth-flotation gold mine performance standard, the preamble is consistent with the Regas Memorandum when it explicitly notes that the EPA has "never sought to regulate fill material under effluent guidelines," 67 Fed. Reg. 31135. If a discharge does not qualify as fill, the EPA's new source performance standard applies. If the discharge qualifies as fill, the performance standard does not apply; and there was no earlier agency practice or policy to the contrary. Pp. 25–26.

(iii) Remarks made by the two agencies in promulgating the fill regulation, which pledge that the EPA's "previou[s] . . . determination[s]" with regard to the application of performance standards "remain vali[d]," are not conclusive of the question at issue. The Regas Memorandum has followed this policy by applying the performance standard to the discharge of water from the lake into the creek. The remarks do not state that the EPA will apply such standards to discharges of fill material. Pp. 26–27.

(iv) While SEACC cites no instance in which the EPA has applied a performance standard to a discharge of fill material, Coeur Alaska cites two instances in which the Corps issued a §404 permit authorizing a mine to discharge solid waste as fill material. These permits illustrate that the agencies did not have a prior practice of applying EPA performance standards to discharges of mining wastes

Syllabus

that qualify as fill material. Pp. 27–28.

486 F. 3d 638, reversed and remanded.

KENNEDY, J., delivered the opinion of the Court, in which ROBERTS, C. J., and THOMAS, BREYER, and ALITO, JJ., joined, and in which SCALIA, J., joined in part. BREYER, J., filed a concurring opinion. SCALIA, J., filed an opinion concurring in part and concurring in the judgment. GINSBURG, J., filed a dissenting opinion, in which STEVENS and SOUTER, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the
preliminary print of the United States Reports.  Readers are requested to
notify the Reporter of Decisions, Supreme Court of the United States, Wash-
ington, D. C. 20543, of any typographical or other formal errors, in order
that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

Nos. 07–984 and 07–990

COEUR ALASKA, INC., PETITIONER
07–984                    *v.*
SOUTHEAST ALASKA CONSERVATION COUNCIL
ET AL.

ALASKA, PETITIONER
07–990                    *v.*
SOUTHEAST ALASKA CONSERVATION COUNCIL
ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 22, 2009]

JUSTICE KENNEDY delivered the opinion of the Court.

These cases require us to address two questions under the Clean Water Act (CWA or Act).  The first is whether the Act gives authority to the United States Army Corps of Engineers, or instead to the Environmental Protection Agency (EPA), to issue a permit for the discharge of min- ing waste, called slurry.  The Corps of Engineers has issued a permit to petitioner Coeur Alaska, Inc. (Coeur Alaska), for a discharge of slurry into a lake in Southeast Alaska.  The second question is whether, when the Corps issued that permit, the agency acted in accordance with law.  We conclude that the Corps was the appropriate agency to issue the permit and that the permit is lawful.

With regard to the first question, §404(a) of the CWA

grants the Corps the power to "issue permits . . . for the discharge of . . . fill material."   86 Stat. 884; 33 U. S. C. §1344(a).  But the EPA also has authority to issue permits for the discharge of pollutants.   Section 402 of the Act grants the EPA authority to "issue a permit for the discharge of any pollutant" "[e]xcept as provided in" §404. 33 U. S. C. §1342(a).    We conclude that because the slurry Coeur Alaska wishes to discharge is defined by regulation as "fill material," 40 CFR §232.2 (2008), Coeur Alaska properly obtained its permit from the Corps of Engineers, under §404, rather than from the EPA, under §402.

The second question is whether the Corps permit is lawful.   Three environmental groups, respondents here, sued the Corps under the Administrative Procedure Act, arguing that the issuance of the permit by the Corps was "not in accordance with law."   5 U. S. C. §706(2)(A).   The environmental groups are Southeast Alaska Conservation Council, Sierra Club, and Lynn Canal Conservation (collectively, SEACC).   The State of Alaska and Coeur Alaska are petitioners here.

SEACC argues that the permit from the Corps is unlawful because the discharge of slurry would violate an EPA regulation promulgated under §306(b) of the CWA, 33 U. S. C. §1316(b).   The EPA regulation, which is called a "new source performance standard," forbids mines like Coeur Alaska's from discharging "process wastewater" into the navigable waters.   40 CFR §440.104(b)(1).   Coeur Alaska, the State of Alaska, and the federal agencies maintain that the Corps permit is lawful nonetheless because the EPA's performance standard does not apply to discharges of fill material.

Reversing the judgment of the District Court, the Court of Appeals held that the EPA's performance standard applies to this discharge so that the permit from the Corps is unlawful.

# I

## A

Petitioner Coeur Alaska plans to reopen the Kensington Gold Mine, located some 45 miles north of Juneau, Alaska. The mine has been closed since 1928, but Coeur Alaska seeks to make it profitable once more by using a technique known as "froth flotation." Coeur Alaska will churn the mine's crushed rock in tanks of frothing water. Chemicals in the water will cause gold-bearing minerals to float to the surface, where they will be skimmed off.

At issue is Coeur Alaska's plan to dispose of the mixture of crushed rock and water left behind in the tanks. This mixture is called slurry. Some 30 percent of the slurry's volume is crushed rock, resembling wet sand, which is called tailings. The rest is water.

The standard way to dispose of slurry is to pump it into a tailings pond. The slurry separates in the pond. Solid tailings sink to the bottom, and water on the surface returns to the mine to be used again.

Rather than build a tailings pond, Coeur Alaska proposes to use Lower Slate Lake, located some three miles from the mine in the Tongass National Forest. This lake is small—800 feet at its widest crossing, 2,000 feet at its longest, and 23 acres in area. See App. 138a, 212a. Though small, the lake is 51 feet deep at its maximum. The parties agree the lake is a navigable water of the United States and so is subject to the CWA. They also agree there can be no discharge into the lake except as the CWA and any lawful permit allow.

Over the life of the mine, Coeur Alaska intends to put 4.5 million tons of tailings in the lake. This will raise the lakebed 50 feet—to what is now the lake's surface—and will increase the lake's area from 23 to about 60 acres. *Id.,* at 361a (62 acres), 212a (56 acres). To contain this wider, shallower body of water, Coeur Alaska will dam the lake's downstream shore. The transformed lake will be isolated

from other surface water.  Creeks and stormwater runoff
will detour around it.  *Id.,* at 298a.  Ultimately, lakewater
will be cleaned by purification systems and will flow from
the lake to a stream and thence onward.  *Id.,* at 309a–
312a.

B

Numerous state and federal agencies reviewed and
approved Coeur Alaska's plans.  At issue here are actions
by two of those agencies: the Corps of Engineers and the
EPA.

1

The CWA classifies crushed rock as a "pollutant."  33
U. S. C. §1362(6).  On the one hand, the Act forbids Coeur
Alaska's discharge of crushed rock "[e]xcept as in compli-
ance" with the Act.  CWA §301(a), 33 U. S. C. §1311(a).
Section 404(a) of the CWA, on the other hand, empowers
the Corps to authorize the discharge of "dredged or fill
material."  33 U. S. C. §1344(a).  The Corps and the EPA
have together defined "fill material" to mean any "mate-
rial [that] has the effect of . . . [c]hanging the bottom ele-
vation" of water.  40 CFR §232.2.  The agencies have
further defined the "discharge of fill material" to include
"placement of . . . slurry, or tailings or similar mining-
related materials."  *Ibid.*

In these cases the Corps and the EPA agree that the
slurry meets their regulatory definition of "fill material."
On that premise the Corps evaluated the mine's plan for a
§404 permit.  After considering the environmental factors
required by §404(b), the Corp issued Coeur Alaska a per-
mit to pump the slurry into Lower Slate Lake.  App. 340a–
378a.

In granting the permit the Corps followed the steps set
forth by §404.  Section 404(b) requires the Corps to con-
sider the environmental consequences of every discharge it

allows. 33 U. S. C. §1344(b). The Corps must apply guidelines written by the EPA pursuant to §404(b). See *ibid.;* 40 CFR pt. 230 (EPA guidelines). Applying those guidelines here, the Corps determined that Coeur Alaska's plan to use Lower Slate Lake as a tailings pond was the "least environmentally damaging practicable" way to dispose of the tailings. App. 366a. To conduct that analysis, the Corps compared the plan to the proposed alternatives.

The Corps determined that the environmental damage caused by placing slurry in the lake will be temporary. And during that temporary disruption, Coeur Alaska will divert waters around the lake through pipelines built for this purpose. *Id.,* at 298a. Coeur Alaska will also treat water flowing from the lake into downstream waters, pursuant to strict EPA criteria. *Ibid.;* see Part I–B–2, *infra.* Though the slurry will at first destroy the lake's small population of common fish, that population may later be replaced. After mining operations are completed, Coeur Alaska will help "recla[im]" the lake by "[c]apping" the tailings with about 4 inches of "native material." App. 361a; *id.,* at 309a. The Corps concluded that

> "[t]he reclamation of the lake will result in more emergent wetlands/vegetated shallows with moderate values for fish habitat, nutrient recycling, carbon/detrital export and sediment/toxicant retention, and high values for wildlife habitat." *Id.*, at 361a.

If the tailings did not go into the lake, they would be placed on nearby wetlands. The resulting pile would rise twice as high as the Pentagon and cover three times as many acres. Reply Brief for Petitioner Coeur Alaska 27. If it were chosen, that alternative would destroy dozens of acres of wetlands—a permanent loss. App. 365a–366a. On the premise that when the mining ends the lake will be at least as environmentally hospitable, if not more so, than now, the Corps concluded that placing the tailings in

the lake will cause less damage to the environment than storing them above ground: The reclaimed lake will be "more valuable to the aquatic ecosystem than a permanently filled wetland . . . that has lost all aquatic functions and values." *Id*., at 361a; see also *id.,* at 366a.

2

The EPA had the statutory authority to veto the Corps permit, and prohibit the discharge, if it found the plan to have "an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas . . . , wildlife, or recreational areas." CWA §404(c), 33 U. S. C. §1344(c). After considering the Corps findings, the EPA did not veto the Corps permit, even though, in its view, placing the tailings in the lake was not the "environmentally preferable" means of disposing of them. App. 300a. By declining to exercise its veto, the EPA in effect deferred to the judgment of the Corps on this point.

The EPA's involvement extended beyond the agency's veto consideration. The EPA also issued a permit of its own—not for the discharge from the mine into the lake but for the discharge from the lake into a downstream creek. *Id.*, at 287a–331a. Section 402 grants the EPA authority to "issue a permit for the discharge of any pollutant," "[e]xcept as provided in [CWA §404]." 33 U. S. C. §1342(a). The EPA's §402 permit authorizes Coeur Alaska to discharge water from Lower Slate Lake into the downstream creek, subject to strict water-quality limits that Coeur Alaska must regularly monitor. App. 303a–304a, 309a.

The EPA's authority to regulate this discharge comes from a regulation, termed a "new source performance standard," that it has promulgated under authority granted to it by §306(b) of the CWA. Section 306(b) gives the EPA authority to regulate the amount of pollutants that certain categories of new sources may discharge into

the navigable waters of the United States. 33 U. S. C. §1316(b). Pursuant to this authority, the EPA in 1982 promulgated a new source performance standard restricting discharges from new froth-flotation gold mines like Coeur Alaska's. The standard is stringent: It allows "no discharge of process wastewater" from these mines. 40 CFR §440.104(b)(1).

Applying that standard to the discharge of water from Lower Slate Lake into the downstream creek, the EPA's §402 permit sets strict limits on the amount of pollutants the water may contain. The permit requires Coeur Alaska to treat the water using "reverse osmosis" to remove aluminum, suspended solids, and other pollutants. App. 298a; *id.*, at 304a. Coeur Alaska must monitor the water flowing from the lake to be sure that the pollutants are kept to low, specified minimums. *Id.,* at 326a–330a.

### C

SEACC brought suit against the Corps of Engineers and various of its officials in the United States District Court for the District of Alaska. The Corps permit was not in accordance with law, SEACC argued, for two reasons. First, in SEACC's view, the permit was issued by the wrong agency—Coeur Alaska ought to have sought a §402 permit from the EPA, just as the company did for the discharge of water from the lake into the downstream creek. See Part I–B–2, *supra.* Second, SEACC contended that regardless of which agency issued the permit, the discharge itself is unlawful because it will violate the EPA new source performance standard for froth-flotation gold mines. (This is the same performance standard described above, which the EPA has already applied to the discharge of water from the lake into the downstream creek. See *ibid.*) SEACC argued that this performance standard also applies to the discharge of slurry into the lake. It contended further that the performance standard is a binding

implementation of §306. Section 306(e) of the CWA makes it "unlawful" for Coeur Alaska to "operate" the mine "in violation of" the EPA's performance standard. 33 U. S. C. §1316(e).

Coeur Alaska and the State of Alaska intervened as defendants. Both sides moved for summary judgment. The District Court granted summary judgment in favor of the defendants.

The Court of Appeals for the Ninth Circuit reversed and ordered the District Court to vacate the Corps of Engineers' permit. *Southeast Alaska Conservation Council* v. *United States Army Corps of Engs.,* 486 F. 3d 638, 654–655 (2007). The court acknowledged that Coeur Alaska's slurry "facially meets the Corps' current regulatory definition of 'fill material,'" *id.,* at 644, because it would have the effect of raising the lake's bottom elevation. But the court also noted that the EPA's new source performance standard "prohibits discharges from froth-flotation mills." *Ibid.* The Court of Appeals concluded that "[b]oth of the regulations appear to apply in this case, yet they are at odds." *Ibid.* To resolve the conflict, the court turned to what it viewed as "the plain language of the Clean Water Act." *Ibid.* The court held that the EPA's new source performance standard "applies to discharges from the froth-flotation mill at Coeur Alaska's Kensington Gold Mine into Lower Slate Lake." *Ibid.*

In addition to the text of the CWA, the Court of Appeals also relied on the agencies' statements made when promulgating their current and prior definitions of "fill material." These statements, in the Court of Appeals' view, demonstrated the agencies' intent that the EPA's new source performance standard govern discharges like Coeur Alaska's. *Id.*, at 648–654.

The Court of Appeals concluded that Coeur Alaska required a §402 permit for its slurry discharge, that the Corps lacked authority to issue such a permit under §404,

and that the proposed discharge was unlawful because it would violate the EPA new source performance standard and §306(e).

The decision of the Court of Appeals in effect reallocated the division of responsibility that the Corps and the EPA had been following. The Court granted certiorari. 554 U. S. ___ (2008). We now hold that the decision of the Court of Appeals was incorrect.

## II

The question of which agency has authority to consider whether to permit the slurry discharge is our beginning inquiry. We consider first the authority of the EPA and second the authority of the Corps. Our conclusion is that under the CWA the Corps had authority to determine whether Coeur Alaska was entitled to the permit governing this discharge.

## A

Section 402 gives the EPA authority to issue "permit[s] for the discharge of any pollutant," with one important exception: The EPA may not issue permits for fill material that fall under the Corps' §404 permitting authority. Section 402(a) states:

> "*Except as provided in . . . [CWA §404, 33 U. S. C. §1344]*, the Administrator may . . . issue a permit for the discharge of any pollutant, . . . notwithstanding [CWA §301(a), 33 U. S. C. §1311(a)], upon condition that such discharge will meet either (A) all applicable requirements under [CWA §301, 33 U. S. C. §1311(a); CWA §302, 33 U. S. C. §1312; CWA §306, 33 U. S. C. §1316; CWA §307, 33 U. S. C. §1317; CWA §308, 33 U. S. C. §1318; CWA §403, 33 U. S. C. §1343], or (B) prior to the taking of necessary implementing actions relating to all such requirements, such conditions as the Administrator determines are necessary to carry

out the provisions of this chapter."    33 U. S. C.
§1342(a)(1) (emphasis added).

Section 402 thus forbids the EPA from exercising permit-
ting authority that is "provided [to the Corps] in" §404.

This is not to say the EPA has no role with respect to
the environmental consequences of fill.  The EPA's func-
tion is different, in regulating fill, from its function in
regulating other pollutants, but the agency does exercise
some authority.  Section 404 assigns the EPA two tasks in
regard to fill material.  First, the EPA must write guide-
lines for the Corps to follow in determining whether to
permit a discharge of fill material.  CWA §404(b); 33
U. S. C. §1344(b).  Second, the Act gives the EPA authority
to "prohibit" any decision by the Corps to issue a permit
for a particular disposal site.  CWA §404(c); 33 U. S. C.
§1344(c).  We, and the parties, refer to this as the EPA's
power to veto a permit.

The Act is best understood to provide that if the Corps
has authority to issue a permit for a discharge under §404,
then the EPA lacks authority to do so under §402.

Even if there were ambiguity on this point, the EPA's
own regulations would resolve it.  Those regulations pro-
vide that "[d]ischarges of dredged or fill material into
waters of the United States which are regulated under
section 404 of CWA" "do not require [§402] permits" from
the EPA.  40 CFR §122.3.

In SEACC's view, this regulation implies that some "fill
material" discharges are not regulated under §404—else,
SEACC asks, why would the regulation lack a comma
before the word "which," and thereby imply that only a
subset of "discharges of . . . fill material" are "regulated
under section 404."  *Ibid.*

The agencies, however, have interpreted this regulation
otherwise.  In the agencies' view the regulation essentially
restates the text of §402, and forbids the EPA from issuing

permits for discharges that "are regulated under section 404." 40 CFR §122.3(b); cf. CWA §402(a) ("[e]xcept as provided in . . . [§404], the Administrator may . . . issue a permit"). Before us, the EPA confirms this reading of the regulation. Brief for Federal Respondents 27. The agency's interpretation is not "plainly erroneous or inconsistent with the regulation"; and so we accept it as correct. *Auer* v. *Robbins*, 519 U. S. 452, 461 (1997) (internal quotation marks omitted).

The question whether the EPA is the proper agency to regulate the slurry discharge thus depends on whether the Corps of Engineers has authority to do so. If the Corps has authority to issue a permit, then the EPA may not do so. We turn to the Corps' authority under §404.

B

Section 404(a) gives the Corps power to "issue permits . . . for the discharge of dredged or fill material." 33 U. S. C. §1344(a). As all parties concede, the slurry meets the definition of fill material agreed upon by the agencies in a joint regulation promulgated in 2002. That regulation defines "fill material" to mean any "material [that] has the effect of . . . [c]hanging the bottom elevation" of water—a definition that includes "slurry, or tailings or similar mining-related materials." 40 CFR §232.2.

SEACC concedes that the slurry to be discharged meets the regulation's definition of fill material. Brief for Respondent SEACC et al. 20. Its concession on this point is appropriate because slurry falls well within the central understanding of the term "fill," as shown by the examples given by the regulation. See 40 CFR §232.2 ("Examples of such fill material include, but are not limited to: rock, sand, soil, clay . . . ."). The regulation further excludes "trash or garbage" from its definition. *Ibid.* SEACC expresses a concern that Coeur Alaska's interpretation of the statute will lead to §404 permits authorizing the dis-

charges of other solids that are now restricted by EPA standards. Brief for Respondent SEACC et al. 44–45 (listing, for example, "feces and uneaten feed," "litter," and waste produced in "battery manufacturing"). But these extreme instances are not presented by the cases now before us. If, in a future case, a discharger of one of these solids were to seek a §404 permit, the dispositive question for the agencies would be whether the solid at issue—for instance, "feces and uneaten feed"—came within the regulation's definition of "fill." SEACC cites no instance in which the agencies have so interpreted their fill regulation. If that instance did arise, and the agencies were to interpret the fill regulation as SEACC fears, then SEACC could challenge that decision as an unlawful interpretation of the fill regulation; or SEACC could claim that the fill regulation as interpreted is an unreasonable interpretation of §404. The difficulties are not presented here, however, because the slurry meets the regulation's definition of fill.

Rather than challenge the agencies' decision to define the slurry as fill, SEACC instead contends that §404 contains an implicit exception. According to SEACC, §404 does not authorize the Corps to permit a discharge of fill material if that material is subject to an EPA new source performance standard.

But §404's text does not limit its grant of power in this way. Instead, §404 refers to all "fill material" without qualification. Nor do the EPA regulations support SEACC's reading of §404. The EPA has enacted guidelines, pursuant to §404(b), to guide the Corps permitting decision. 40 CFR pt. 230. Those guidelines do not strip the Corps of power to issue permits for fill in cases where the fill is also subject to an EPA new source performance standard.

SEACC's reading of §404 would create numerous difficulties for the regulated industry. As the regulatory re-

gime stands now, a discharger must ask a simple question—is the substance to be discharged fill material or not? The fill regulation, 40 CFR §232.2, offers a clear answer to that question; and under the agencies' view, that answer decides the matter—if the discharge is fill, the discharger must seek a §404 permit from the Corps; if not, only then must the discharger consider whether any EPA performance standard applies, so that the discharger requires a §402 permit from the EPA.

Under SEACC's interpretation, however, the discharger would face a more difficult problem. The discharger would have to ask—is the fill material also subject to one of the many hundreds of EPA performance standards, so that the permit must come from the EPA, not the Corps? The statute gives no indication that Congress intended to burden industry with that confusing division of permit authority.

The regulatory scheme discloses a defined, and workable, line for determining whether the Corps or the EPA has the permit authority. Under this framework, the Corps of Engineers, and not the EPA, has authority to permit Coeur Alaska's discharge of the slurry.

## III

A second question remains: In issuing the permit did the Corps act in violation of a statutory mandate so that the issuance was "not in accordance with law"? 5 U. S. C. §706(2)(A). SEACC contends that the slurry discharge will violate the EPA's new source performance standard and that the Corps permit is made "unlawful" by CWA §306(e). Petitioners and the agencies argue that the permit is lawful because the EPA performance standard, and §306(e), do not apply to fill material regulated by the Corps. In order to determine whether the Corps permit is lawful we must answer the question: Do EPA performance standards, and §306(e), apply to discharges of fill mate-

rial?

We address in turn the statutory text of the CWA, the agencies' regulations construing it, and the EPA's subsequent interpretation of those regulations. Because Congress has not "directly spoken" to the "precise question" of whether an EPA performance standard applies to discharges of fill material, the statute alone does not resolve the case. *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 842 (1984). We look first to the agency regulations, which are entitled to deference if they resolve the ambiguity in a reasonable manner. *Ibid.;* see *United States* v. *Mead Corp.,* 533 U. S. 218, 226–227 (2001). But the regulations, too, are ambiguous, so we next turn to the agencies' subsequent interpretation of those regulations. *Id.,* at 234–238; *Auer,* 519 U. S., at 461. In an internal memorandum the EPA explained that its performance standards do not apply to discharges of fill material. That interpretation is not "plainly erroneous or inconsistent with the regulation[s]," and so we accept it as correct. *Ibid.* (internal quotation marks omitted). Though SEACC contends that the agencies' interpretation is not entitled to deference because it contradicts the agencies' published statements and prior practice, we disagree with SEACC's reading of those statements and of the regulatory record.

### A

As for the statutory argument, SEACC claims the CWA §404 permit is unlawful because §306(e) forbids the slurry discharge. Petitioners and the federal agencies, in contrast, contend that §306(e) does not apply to the slurry discharge.

### 1

To address SEACC's statutory argument, it is necessary to review the EPA's responsibilities under the CWA. As

noted, §306 empowers the EPA to regulate the froth-flotation gold mining industry. See 33 U. S. C. §1316(b). Pursuant to this authority, EPA promulgated the new source performance standard relied upon by SEACC. The standard is stringent. If it were to apply here, it would allow "no discharge of process wastewater" from the mine. 40 CFR §440.104(b)(1).

The term "process wastewater" includes solid waste. So the regulation forbids not only pollutants that dissolve in water but also solid pollutants suspended in water—what the agency terms "total suspended solids," or TSS. See §440.104(a) (limiting the amount of TSS from other kinds of mines); see also EPA Development Document for Effluent Limitations Guidelines and Standards for the Ore Mining and Dressing Point Source Category 157–158 (Nov. 1982) (the amount of TSS in "wastewater" from froth-flotation mines is "generally high"); *id.,* at 175 (Table VI–6) (measuring the amounts of TSS in samples of froth-flotation mines' discharges); *id.,* at 194 (stating an intent to "regulat[e]" TSS); *id.,* at 402 (evaluating the costs of constructing a "settling pond"); *id.,* at 535 (concluding that even in mountainous regions, a froth-flotation mine will be able to construct a "tailings impoundment" to "provide a disposal area for mill tailings").

Were there any doubt about whether the EPA's new source performance standard forbade solids as well as soluble pollutants, the agency's action in these cases would resolve it. Here, the EPA's §402 permit authorizes Coeur Alaska to discharge water from Lower Slate Lake into a downstream creek, provided the water meets the quality requirements set by the performance standard. This demonstrates that the performance standard regulates solid waste. The EPA's permit not only restricts the amount of total suspended solids, App. 327a (Table 3), but also forbids the mine from allowing any "floating solids" to flow from the lake. *Id.,* at 328a. No party disputes the

EPA's authority to regulate these discharges of solid mining waste; and no party questions the validity of the EPA's new source performance standard when it is applicable.

When the performance standard applies to a point source, §306(e) makes it "unlawful" for that point source to violate it: "[I]t shall be unlawful for any owner or operator of any new source to operate such source in violation of any standard of performance applicable to such source." CWA §306(e), 33 U. S. C. §1316(e).

SEACC argues that this provision, §306(e), forbids the mine from discharging slurry into Lower Slate Lake. SEACC contends the new source performance standard is, in the words of §306(e), "applicable to" the mine. Both the text of the performance standard and the EPA's application of it to the discharge of mining waste from Lower Slate Lake demonstrate that the performance standard is "applicable to" Coeur Alaska's mine in some circumstances. And so, SEACC reasons, it follows that because the new source performance standard forbids even minute discharges of solid waste, it also forbids the slurry discharge, 30% of which is solid waste.

2

For their part, the State of Alaska and the federal agencies claim that the Act is unambiguous in the opposite direction. They rely on §404 of the Act. As explained above, that section authorizes the Corps of Engineers to determine whether to issue a permit allowing the discharge of the slurry. Petitioners and the agencies argue that §404 grants the Corps authority to do so without regard to the EPA's new source performance standard or the §306(e) prohibition discussed above.

Petitioners and the agencies make two statutory arguments based on §404's silence in regard to §306. First, they note that nothing in §404 requires the Corps to consider the EPA's new source performance standard or the

§306(e) prohibition. That silence advances the argument that §404's grant of authority to "issue permits" contradicts §306(e)'s declaration that discharges in violation of new source performance standards are "unlawful."

Second, petitioners and the agencies point to §404(p), which protects §404 permitees from enforcement actions by the EPA or private citizens:

> "Compliance with a permit issued pursuant to this section . . . shall be deemed compliance, for purposes of sections 1319 [CWA §309] and 1365 [CWA §505] of this title, with sections 1311 [CWA §301], 1317 [CWA §307], and 1343 [CWA §403] of this title." 33 U. S. C. §1344(p).

Here again, their argument is that silence is significant. Section 404(p) protects the permitee from lawsuits alleging violations of CWA §301 (which bars the discharge of "any pollutant" "except as in compliance" with the Act), §307 (which bars the discharge of "toxic pollutants"); and §403 (which bars discharges into the sea). But §404(p) does not in express terms protect the permitee from a lawsuit alleging a violation of §306(e) or of the EPA's new source performance standards. Section 404(p)'s silence regarding §306 is made even more significant because a parallel provision in §402 does protect a §402 permitee from an enforcement action alleging a violation of §306. CWA §402(k), 33 U. S. C. §1342(k).

In our view, Congress' omission of §306 from §404, and its inclusion of §306 in §402(k), is evidence that Congress did not intend §306(e) to apply to Corps §404 permits or to discharges of fill material. If §306 did apply, then the Corps would be required to evaluate each permit application for compliance with §306, and issue a permit only if it found the discharge would comply with §306. But even if that finding were made, it is not clear that the §404 permitee would be protected from a suit seeking a judicial

determination that the discharge violates §306.

### 3

The CWA is ambiguous on the question whether §306 applies to discharges of fill material regulated under §404. On the one hand, §306 provides that a discharge that violates an EPA new source performance standard is "unlawful"—without any exception for fill material. On the other hand, §404 grants the Corps blanket authority to permit the discharge of fill material—without any mention of §306. This tension indicates that Congress has not "directly spoken" to the "precise question" of whether §306 applies to discharges of fill material. *Chevron,* 467 U. S., at 842.

### B

Before turning to how the agencies have resolved that question, we consider the formal regulations that bear on §§306 and 404. See *Mead,* 533 U. S., at 234–238. The regulations, like the statutes, do not address the question whether §306, and the EPA new source performance standards promulgated under it, apply to §404 permits and the discharges they authorize. There is no regulation, for example, interpreting §306(e)'s text—"standard of performance applicable to such source"—to mean that a performance standard ceases to be "applicable" the moment the discharge qualifies as fill material, which would resolve the cases in petitioners' favor. Nor is there a regulation providing that the Corps, in deciding whether to grant a permit under §404, must deny that permit if the discharge would violate §306(e), which would decide the cases for SEACC.

Rather than address the tension between §§306 and 404, the regulations instead implement the statutory framework without elaboration on this point. Each of the two principal regulations, which have been mentioned above, seems to stand on its own without reference to the

other. The EPA's new source performance standard contains no exception for fill material; and it forbids any discharge of "process wastewater," a term that includes solid wastes. 40 CFR §440.104(b)(1); see Part III–A–1, *supra*. The agencies' joint regulation defining fill material is also unqualified. It includes "slurry, or tailings or similar mining-related materials" in its definition of a "discharge of fill material," 40 CFR §232.2; and it contains no exception for slurry that is regulated by an EPA performance standard.

The parties point to additional regulations, but these provisions do not offer a clear basis of reconciliation. An EPA regulation, mentioned above, provides that "[d]ischarges of dredged or fill material into waters of the United States which are regulated under section 404 of CWA" "do not require [§402] permits" from the EPA. §122.3. As we have explained, however, this merely states that a permit for this discharge cannot be issued by the EPA. See Part II, *supra*. The regulation does not answer the question whether the EPA's new source performance standard, and §306(e), apply to a discharge regulated by the Corps under §404.

The agencies also direct us to the §404(b) guidelines written by the EPA to guide the Corps permitting decision. See 40 CFR pt. 230. The agencies note that these guidelines do not expressly require the Corps, in issuing a permit, to consider whether the discharge would violate EPA's performance standards. Here we think failure to mention §306 or the EPA new source performance standards does offer some indication that these are not relevant to the §404 permit, though the argument falls short of being conclusive. The Corps' own regulations require the agency to evaluate permit applications "for compliance with applicable [EPA] effluent limitations." 33 CFR §320.4(d) (2008). The regulations do not answer whether the new source performance standard is "applicable" to a

discharge of fill material.

## C

The regulations do not give a definitive answer to the question whether §306 applies to discharges regulated by the Corps under §404, but we do find that agency interpretation and agency application of the regulations are instructive and to the point. *Auer*, 519 U. S., at 461. The question is addressed and resolved in a reasonable and coherent way by the practice and policy of the two agencies, all as recited in a memorandum written in May 2004 by Diane Regas, then the Director of the EPA's Office of Wetlands, Oceans and Watersheds, to Randy Smith, the Director of the EPA's regional Office of Water with responsibility over the mine. App. 141a–149a (Regas Memorandum). The Memorandum, though not subject to sufficiently formal procedures to merit *Chevron* deference, see *Mead*, *supra*, at 234–238, is entitled to a measure of deference because it interprets the agencies' own regulatory scheme. See *Auer*, *supra*, at 461.

The Regas Memorandum explains:

> "As a result [of the fact that the discharge is regulated under §404], the regulatory regime applicable to discharges under section 402, including effluent limitations guidelines and standards, such as those applicable to gold ore mining . . . do not apply to the placement of tailings into the proposed impoundment [of Lower Slate Lake]. See 40 CFR §122.3(b)." App. 144a–145a.

The regulation that the Memorandum cites—40 CFR §122.3—is one we considered above and found ambiguous. That regulation provides: "[d]ischarges of dredged or fill material into waters of the United States which are regulated under section 404 of CWA" "do not require [§402] permits." The Regas Memorandum takes an instructive

interpretive step when it explains that because the discharge "do[es] not require" an EPA permit, *ibid.*, the EPA's performance standard "do[es] not apply" to the discharge. App. 145a. The Memorandum presents a reasonable interpretation of the regulatory regime. We defer to the interpretation because it is not "plainly erroneous or inconsistent with the regulation[s]." *Auer, supra*, at 461 (internal quotation marks omitted). Five factors inform that conclusion.

First, the Memorandum preserves a role for the EPA's performance standard. It confines the Memorandum's scope to closed bodies of water, like the lake here. App. 142a–143a, n. 1. When slurry is discharged into a closed body of water, the Memorandum explains, the EPA's performance standard retains an important role in regulating the discharge into surrounding waters. The Memorandum does not purport to invalidate the EPA's performance standard.

Second, the Memorandum acknowledges that this is not an instance in which the discharger attempts to evade the requirements of the EPA's performance standard. The Kensington Mine is not, for example, a project that smuggles a discharge of EPA-regulated pollutants into a separate discharge of Corps-regulated fill material. The instant cases do not present a process or plan designed to manipulate the outer boundaries of the definition of "fill material" by labeling minute quantities of EPA-regulated solids as fill. The Memorandum states that when a discharge has only an "incidental filling effect," the EPA's performance standard continues to govern that discharge. *Id.,* at 145a.

Third, the Memorandum's interpretation preserves the Corps' authority to determine whether a discharge is in the public interest. See 33 CFR §320.4(a)(1); 40 CFR §230.10. The Corps has significant expertise in making this determination. Applying it, the Corps determined

that placing slurry in the lake will improve that body of water by making it wider, shallower, and so more capable of sustaining aquatic life. The Corps determined, furthermore, that the alternative—a heap of tailings larger than the Pentagon placed upon wetlands—would cause more harm to the environment. Because the Memorandum preserves an important role for the Corps' expertise, its conclusion that the EPA's performance standard does not apply is a reasonable one.

Fourth, the Regas Memorandum's interpretation does not allow toxic pollutants (as distinguished from other, less dangerous pollutants, such as slurry) to enter the navigable waters. The EPA has regulated toxic pollutants under a separate provision, §307 of the CWA, and the EPA's §404(b) guidelines require the Corps to deny a §404 permit for any discharge that would violate the EPA's §307 toxic-effluent limitations. 40 CFR §230.10(b)(2).

Fifth, as a final reason to defer to the Regas Memorandum, we find it a sensible and rational construction that reconciles §§306, 402, and 404, and the regulations implementing them, which the alternatives put forward by the parties do not. SEACC's argument, that §402 applies to this discharge and not §404, is not consistent with the statute and regulations, as already noted. See Part II, *supra*.

The Court requested the parties to submit supplemental briefs addressing whether the CWA contemplated that both agencies would issue a permit for a discharge. 556 U. S. ___ (2009). A two-permit regime would allow the EPA to apply its performance standard, while the Corps could apply its §404(b) criteria. The parties agree, however, that a two-permit regime is contrary to the statute and the regulations. We conclude that this is correct. A two-permit regime would cause confusion, delay, expense, and uncertainty in the permitting process. In agreement with all of the parties, we conclude that, when a permit is

required to discharge fill material, either a §402 or a §404 permit is necessary. Here, we now hold, §404 applies, not §402. See Part II, *supra.*

The Regas Memorandum's interpretation of the agencies' regulations is consistent with the regulatory scheme as a whole. The Memorandum preserves a role for the EPA's performance standards; it guards against the possibility of evasion of those standards; it employs the Corps' expertise in evaluating the effects of fill material on the aquatic environment; it does not allow toxic pollutants to be discharged; and we have been offered no better way to harmonize the regulations. We defer to the EPA's conclusion that its performance standard does not apply to the initial discharge of slurry into the lake but applies only to the later discharge of water from the lake into the downstream creek.

D

SEACC argues against deference to the Regas Memorandum. In its view the Regas Memorandum is contrary to published agency statements and earlier agency practice. SEACC cites three agency statements: A 1986 "memorandum of understanding" between the EPA and the Corps regarding the definition of fill material; the preamble to the agencies' current 2002 fill regulation; and comments made by the agencies in promulgating the 2002 fill regulation. These arguments are not convincing.

1

In 1986, to reconcile their then-differing definitions of "fill material," the EPA and the Corps issued a "memorandum of agreement." 51 Fed. Reg. 8871 (MOA). The memorandum was not made subject to notice-and-comment procedures, but it was published in the Federal Register. It defined the statutory term "fill material" until the current definition took effect in 2002. Brief for Fed-

eral Respondents 30–31, n. 8.

SEACC points to paragraph B(5) of the MOA, which reads:

> "[A] pollutant (other than dredged material) will normally be considered by EPA and the Corps to be subject to section 402 if it is a discharge in liquid, semi-liquid, or suspended form or if it is a discharge of solid material of a homogeneous nature normally associated with single industry wastes . . . . These materials include placer mining wastes, phosphate mining wastes, titanium mining wastes, sand and gravel wastes, fly ash, and drilling muds. As appropriate, EPA and the Corps will identify additional such materials." 51 Fed. Reg. 8872.

It is true, as SEACC notes, that this passage suggests that §402 will "normally" apply to discharges of "suspended"—*i.e.,* solid—pollutants. But that statement is not contrary to the Regas Memorandum, which acknowledges that the EPA retains authority under §402 to regulate the discharge of suspended solids from Lower Slate Lake into downstream waters. This passage does not address the question presented by these cases, and answered by the Regas Memorandum, as to whether the EPA's performance standard applies when the discharge qualifies as fill material. In fact, the MOA's preamble suggests that when a discharge qualifies as "fill material," the Corps retains authority to regulate it under §404:

> "Discharges listed in the Corps definition of 'discharge of fill material,' . . . remain subject to section 404 even if they occur in association with discharges of wastes meeting the criteria in the agreement for section 402 discharges." *Id.,* at 8871.

The MOA is quite consistent with the agencies' determination that the Corps regulates all discharges of fill mate-

rial and that §306 does not apply to these discharges.

2

SEACC draws our attention to the preamble of the current fill material regulation. 67 Fed. Reg. 31129 (2002) (final rule). It cites the opening passages of the preamble, which state:

> "[T]oday's rule is generally consistent with current agency practice and so it does not expand the types of discharges that will be covered under section 404." *Id.*, at 31133.

In SEACC's view, this passage demonstrates that the fill rule was not intended to displace the pre-existing froth-flotation gold mine performance standard, which has been on the books since 1982.

The preamble goes on to say, in a section entitled "Effluent Guideline Limitations and 402 Permits":

> "[W]e emphasize that today's rule generally is intended to maintain our existing approach to regulating pollutants under either section 402 or 404 of the CWA. Effluent limitation guidelines and new source performance standards ('effluent guidelines') promulgated under section 304 and 306 of the CWA establish limitations and standards for specified wastestreams from industrial categories, and those limitations and standards are incorporated into permits issued under section 402 of the Act. EPA has never sought to regulate fill material under effluent guidelines. Rather, effluent guidelines restrict discharges of pollutants from identified wastestreams based upon the pollutant reduction capabilities of available treatment technologies. Recognizing that some discharges (such as suspended or settleable solids) can have the associated effect, over time, of raising the bottom elevation of a water due to settling of waterborne pollutants, we

do not consider such pollutants to be 'fill material,' and nothing in today's rule changes that view. Nor does today's rule change any determination we have made regarding discharges that are subject to an effluent limitation guideline and standards, which will continue to be regulated under section 402 of the CWA. Similarly, this rule does not alter the manner in which water quality standards currently apply under the section 402 or the section 404 programs." *Id.*, at 31135.

Although the preamble asserts it does not change agency policy with regard to EPA performance standards and §402 permitting decisions, it is explicit in noting that the EPA has "never sought to regulate fill material under effluent guidelines." *Ibid.* The preamble, then, is consistent with the Regas Memorandum. If a discharge does not qualify as fill material, the EPA's new source performance standard applies. If the discharge qualifies as fill, the performance standard does not apply; and there was no earlier agency practice or policy to the contrary.

3

SEACC also cites remarks made by the agencies in response to public comments on the proposed fill material regulation. App. 22a–127a. These remarks were incorporated by reference into the administrative record. 67 Fed. Reg. 31131.

Responding to a question about whether "mine tailings" would be "subject to section 404 regulation as opposed to section 402" under the 2002 fill regulation, the agencies stated:

"Today's final rule clarifies that any material that has the effect of fill is regulated under section 404 and further that the placement of 'overburden, slurry, or tailings or similar mining-related materials' is consid-

ered a discharge of fill material. Nevertheless, if EPA
has previously determined that certain materials are
subject to an [effluent limitation guideline] under spe-
cific circumstances, then that determination remains
valid. Moreover, . . . permits issued pursuant to sec-
tion 402 are intended to regulate process water and
provide effluent limits that are protective of receiving
water quality. This distinction provides the frame-
work for today's rule." App. 48a.

This statement is not conclusive of the issue. SEACC
notes that this response, like the regulation's preamble,
pledges that EPA's "previou[s] . . . determination[s]" with
regard to the application of performance standards "re-
mai[n] valid." But, as noted above, the Regas Memoran-
dum has followed this policy by applying the EPA's per-
formance standard to the discharge of water from the lake
into the downstream creek. The response does not state
that the EPA will apply its performance standards to
discharges of fill material.

4

The agencies' published statements indicate adherence
to the EPA's previous application and interpretation of its
performance standards. SEACC cannot show that the
agencies have changed their interpretation or application
of their regulations.

SEACC cites no instance in which the EPA has applied
one of its performance standards to a discharge of fill
material. By contrast, Coeur Alaska cites two instances in
which the Corps issued a §404 permit authorizing a mine
to discharge solid waste (tailings) as fill material. See
Brief for Petitioner Coeur Alaska 40–42. SEACC objects
that those two §404 permits authorized discharges that
used the tailings to construct useful structures—a dam in
one case, a tailings pond in another. Here, by contrast,
SEACC contends that the primary purpose of the dis-

charge is to use a navigable water to dispose of waste. *Ibid.* But that objection misses the point. The two §404 permits cited by Coeur Alaska illustrate that the agencies did not have a prior practice of applying EPA performance standards to discharges of mining wastes that qualify as fill material.

SEACC has not demonstrated that the agencies have changed their policy, and it cannot show that the Regas Memorandum is contrary to the agencies' published statements.

*       *       *

We accord deference to the agencies' reasonable decision to continue their prior practice.

The judgment of the Court of Appeals is reversed, and these cases are remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

———————

Nos. 07–984 and 07–990

———————

COEUR ALASKA, INC., PETITIONER
07–984                    *v.*
SOUTHEAST ALASKA CONSERVATION COUNCIL
ET AL.


ALASKA, PETITIONER
07–990                    *v.*
SOUTHEAST ALASKA CONSERVATION COUNCIL
ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 22, 2009]

JUSTICE BREYER, concurring.

As I understand the Court's opinion, it recognizes a legal zone within which the regulating agencies might reasonably classify material either as "dredged or fill material" subject to §404 of the Clean Water Act, 33 U. S. C. §1344(a), or as a "pollutant," subject to §§402 and 306, 33 U. S. C. §§1342(a), 1316(a). Within this zone, the law authorizes the environmental agencies to classify material as the one or the other, so long as they act within the bounds of relevant regulations, and provided that the classification, considered in terms of the purposes of the statutes and relevant regulations, is reasonable.

This approach reflects the difficulty of applying §§402 and 306 literally to *every* new-source-related discharge of a "pollutant." The Environmental Protection Agency (EPA) applies §306 new source "performance standards" to a wide variety of discharges, ranging, for example, from

those involved in the processing of apples into apple juice or apple cider, 40 CFR §407.10 (2008); to the manufacturing of cement, §411.10; to the production of fresh meat cuts by a meat cutter, §432.60; and to the manufacture of pharmaceutical products by fermentation, §439.10. See generally 40 CFR pts. 405–471 (containing more than 800 pages of "new source performance" and effluent limitation regulations). At the same time the regulations for any one point source often regulate numerous chemicals, minerals, and other substances produced by that point source; in the case of fermentation products, for example, the regulations provide performance standards for roughly 30 different chemicals. §439.15. These "standards of performance" "reflect the greatest degree of effluent reduction which the Administrator determines to be achievable through application of the best available demonstrated control technology . . . including, where practicable, a standard permitting no discharge of pollutants." 33 U. S. C. §1316(a)(1).

To literally apply these performance standards so as to forbid the use of any of these substances as "fill," even when, say, they constitute no more than trace elements in dirt, crushed rock, or sand that is clearly being used as "fill" to build a levee or to replace dirt removed from a lake bottom may prove unnecessarily strict, cf. §1362(6) (defining "pollutant" to include "rock"), to the point that such application would undermine the objective of §404, which foresees the use of "dredged or fill material" in certain circumstances and with approval of the relevant agencies. §1344. At minimum, the EPA might reasonably read the statute and the applicable regulations as allowing the use of such material, say crushed rock, as "fill" in some of these situations. Cf. *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 842–844 (1984); *Auer* v. *Robbins*, 519 U. S. 452, 461 (1997).

At the same time, I recognize the danger that JUSTICE GINSBURG warns against, namely, that "[w]hole categories

of regulated industries" might "gain immunity from a variety of pollution-control standards," if, say, a §404-permit applicant simply adds "sufficient solid matter" to a pollutant "to raise the bottom of a water body," thereby turning a "pollutant" governed by §306 into "fill" governed by §404. *Post*, at 7 (dissenting opinion).

Yet there are safeguards against that occurring. For one thing, as the Court recognizes, see *ante*, at 11, it is not the case that *any* material that has the "'effect of . . . [c]hanging the bottom elevation'" of the body of water is automatically subject to §404, not §402. The EPA has never suggested that it would interpret the regulations so as to turn §404 into a loophole, permitting evasion of a "performance standard" simply because a polluter discharges enough pollutant to raise the bottom elevation of the body of water. For another thing, even where a matter is determined reasonably to be "fill" and consequently falls within §404, the EPA can retain an important role in the permitting process. That is because the EPA may veto any §404 plan that it finds has an "unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas . . . , wildlife, or recreational areas." §1344(c). Finally, EPA's decision not to apply §306, but to allow permitting to proceed under §404, must be a reasonable decision; and court review will help assure that is so. 5 U. S. C. §706.

In these cases, it seems to me that the EPA's interpretation of the statute as permitting the EPA/Corps of Engineers "fill" definition to apply to the cases at hand is reasonable, hence lawful. Lower Slate Lake, located roughly three miles from the Kensington Gold Mine, is 51 feet deep, 800 feet wide, and 2,000 feet long; downstream from the lake is Slate Creek. Faced with a difficult choice between creating a huge pile of slurry on nearby wetlands or using part of the lake as a storage facility for mine tailings, see App. 294a–298a; see also *ante*, at 5–8, the

EPA arrived at a compromise. On the one hand, it would treat mine tailings placed directly into the lake as "fill" under the §404 permitting program. App. 144a. The tailings, the EPA recognized, would have the "immediate effect of filling the areas of water into which they are discharged." *Ibid.* But it would also treat any spillover of the tailings, or chemicals from the tailings, into any nearby waterway, most particularly Slate Creek (running out of Slate Lake) as requiring a §402 permit. The EPA's §306 "performance standard" would apply and that standard insists upon *no discharge of process wastewater at all. Id.*, at 145a; see also 40 CFR §440.104(b). The EPA reached this result because it recognized that, even though pollutants discharged into the creek might come "in the form of suspended and settleable solids," such solids would "have, at most, an incidental filling effect." App. 145a. The EPA thereby sought to apply the distinction it had previously recognized between discharges that have the immediate effect of raising the bottom elevation of water, and those that only have the "associated effect, over time, of raising the bottom elevation of a water due to settling of waterborne pollutants." See 67 Fed. Reg. 31135 (2002) (concluding that §402 applies to the latter); see also Brief for G. Tracy Mehan III as *Amicus Curiae* 22–23.

I cannot say whether the EPA's compromise represents the best overall environmental result; but I do believe it amounts to the kind of detailed decision that the statutes delegate authority to the EPA, not the courts, to make (subject to the bounds of reasonableness). I believe the Court's views are consistent with those I here express. And with that understanding, I join its opinion.

# SUPREME COURT OF THE UNITED STATES

————

Nos. 07–984 and 07–990

————

## COEUR ALASKA, INC., PETITIONER
07–984                    *v.*
SOUTHEAST ALASKA CONSERVATION COUNCIL
ET AL.

## ALASKA, PETITIONER
07–990                    *v.*
SOUTHEAST ALASKA CONSERVATION COUNCIL
ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 22, 2009]

JUSTICE SCALIA, concurring in part and concurring in the judgment.

I join the opinion of the Court, except for its protestation, *ante*, at 20, that it is not according *Chevron* deference to the reasonable interpretation set forth in the memorandum sent by the Director of the Environmental Protection Agency's (EPA) Office of Wetlands, Oceans and Watersheds, to the Director of the EPA's regional Office of Water with responsibility over the Coeur Alaska mine—an interpretation consistently followed by both EPA and the Corps of Engineers, and adopted by both agencies in the proceedings before this Court. See *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837 (1984). The opinion purports to give this agency interpretation "a measure of deference" because it involves an interpretation of "the agencies' own regulatory scheme," and "'the regulatory regime,'" *ante,* at 20 (citing *Auer* v. *Robbins*, 519

U. S. 452, 461 (1997)).  *Auer*, however, stands only for the
principle that we defer to an agency's interpretation *of its
own ambiguous regulation*.  But it becomes obvious from
the ensuing discussion that the referenced "regulatory
scheme," and "regulatory regime" for which the Court
accepts the agency interpretation includes not just the
agencies' own regulations but also (and indeed primarily)
the conformity of those regulations with the ambiguous
governing statute, which is the primary dispute here.

Surely the Court is not adding to our already inscruta-
ble opinion in *United States* v. *Mead Corp.*, 533 U. S. 218
(2001), the irrational fillip that an agency position which
otherwise does not qualify for *Chevron* deference *does*
receive *Chevron* deference if it clarifies not just an am-
biguous statute but *also* an ambiguous regulation.  One
must conclude, then, that if today's opinion is *not* accord-
ing the agencies' reasonable and authoritative interpreta-
tion of the Clean Water Act *Chevron* deference, it is ac-
cording some *new* type of deference—perhaps to be called
in the future *Coeur Alaska* deference—which is identical
to *Chevron* deference except for the name.

The Court's deference to the EPA and the Corps of
Engineers in today's cases is eminently reasonable.  It is
quite impossible to achieve predictable (and relatively
litigation-free) administration of the vast body of complex
laws committed to the charge of executive agencies with-
out the assurance that reviewing courts will accept rea-
sonable and authoritative agency interpretation of am-
biguous provisions.  If we must not call that practice
*Chevron* deference, then we have to rechristen the rose.
Of course the only reason a new name is required is our
misguided opinion in *Mead*, whose incomprehensible
criteria for *Chevron* deference have produced so much
confusion in the lower courts* that there has now appeared

––––––––––

* Compare, *e.g., Kruse* v. *Wells Fargo Home Mortgage, Inc.*, 383 F. 3d

the phenomenon of *Chevron* avoidance—the practice of declining to opine whether *Chevron* applies or not. See Bressman, How *Mead* Has Muddled Judicial Review of Agency Action, 58 Vand. L. Rev. 1443, 1464 (2005).

I favor overruling *Mead.* Failing that, I am pleased to join an opinion that effectively ignores it.

———————

49, 61 (CA2 2004) (according *Chevron* deference to policy statements issued by Department of Housing and Urban Development) and *Schuetz* v. *Banc One Mortgage Corp.*, 292 F. 3d 1004, 1012 (CA9 2002) (same), with *Krzalic* v. *Republic Title Co.*, 314 F. 3d 875, 881 (CA7 2002) (denying *Chevron* deference to same policy statements). Compare *American Federation of Govt. Employees, AFL–CIO, Local 446* v. *Nicholson*, 475 F. 3d 341, 353–354 (CADC 2007) (according *Chevron* deference to informal adjudication by Department of Veterans Affairs), with *American Federation of Govt. Employees, AFL–CIO, Local 2152* v. *Principi*, 464 F. 3d 1049, 1057 (CA9 2006) (denying *Chevron* deference to similar action). It is not even clear that notice-and-comment rulemaking will assure *Chevron* deference to agency interpretation of an ambiguous statute. See *Rubie's Costume Co.* v. *United States*, 337 F. 3d 1350, 1355 (CA Fed. 2003) (customs classification).

# SUPREME COURT OF THE UNITED STATES

―――――――

Nos. 07–984 and 07–990

―――――――

COEUR ALASKA, INC., PETITIONER
07–984                *v.*
SOUTHEAST ALASKA CONSERVATION COUNCIL
ET AL.


ALASKA, PETITIONER
07–990                *v.*
SOUTHEAST ALASKA CONSERVATION COUNCIL
ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 22, 2009]

JUSTICE GINSBURG, with whom JUSTICE STEVENS and JUSTICE SOUTER join, dissenting.

Petitioner Coeur Alaska, Inc., proposes to discharge 210,000 gallons per day of mining waste into Lower Slate Lake, a 23-acre subalpine lake in Tongass National Forest. The "tailings slurry" would contain concentrations of aluminum, copper, lead, and mercury. Over the life of the mine, roughly 4.5 million tons of solid tailings would enter the lake, raising the bottom elevation by 50 feet. It is undisputed that the discharge would kill all of the lake's fish and nearly all of its other aquatic life.[1]

Coeur Alaska's proposal is prohibited by the Environmental Protection Agency (EPA) performance standard

――――――

[1] Whether aquatic life will eventually be able to inhabit the lake again is uncertain. Compare *ante*, at 5, with App. 201a–202a; and *Southeast Alaska Conservation Council* v. *United States Army Corps of Engineers*, 486 F. 3d 638, 642 (CA9 2007).

forbidding any discharge of process wastewater from new "froth-flotation" mills into waters of the United States. See 40 CFR §440.104(b)(1) (2008). Section 306 of the Clean Water Act directs EPA to promulgate such performance standards, 33 U. S. C. §1316(a), and declares it unlawful for any discharger to violate them, §1316(e). Ordinarily, that would be the end of the inquiry.

Coeur Alaska contends, however, that its discharge is not subject to EPA's regulatory regime, but is governed, instead, by the mutually exclusive permitting authority of the Army Corps of Engineers. The Corps has authority, under §404 of the Act, §1344(a), to issue permits for discharges of "dredged or fill material." By regulation, a discharge that has the effect of raising a water body's bottom elevation qualifies as "fill material." See 33 CFR §323.2(e) (2008). Discharges properly within the Corps' permitting authority, it is undisputed, are not subject to EPA performance standards. See *ante*, at 20; Brief for Petitioner Coeur Alaska 26; Brief for Respondent Southeast Alaska Conservation Council et al. 37.

The litigation before the Court thus presents a single question: Is a pollutant discharge prohibited under §306 of the Act eligible for a §404 permit as a discharge of fill material? In agreement with the Court of Appeals, I would answer no. The statute's text, structure, and purpose all mandate adherence to EPA pollution-control requirements. A discharge covered by a performance standard must be authorized, if at all, by EPA.

I
A

Congress enacted the Clean Water Act in 1972 "to restore and maintain the chemical, physical, and biological integrity" of the waters of the United States. 33 U. S. C. §1251(a). "The use of any river, lake, stream or ocean as a waste treatment system," the Act's drafters stated, "is

unacceptable." S. Rep. No. 92–414, p. 7 (1971). Congress announced in the Act itself an ambitious objective: to eliminate, by 1985, the discharge of all pollutants into the Nation's navigable waters. 33 U. S. C. §1251(a).

In service of its goals, Congress issued a core command: "[T]he discharge of any pollutant by any person shall be unlawful," except in compliance with the Act's terms. §1311(a). The Act's substantive requirements—housed primarily in Subchapter III, "Standards and Enforcement"—establish "a comprehensive regulatory program supervised by an expert administrative agency," EPA. *Milwaukee* v. *Illinois*, 451 U. S. 304, 317 (1981). See also 33 U. S. C. §1251(d) ("Except as otherwise expressly provided . . . , the Administrator of [EPA] shall administer this [Act].").

The Act instructs EPA to establish various technology-based, increasingly stringent effluent limitations for categories of point sources. *E.g.,* §§1311, 1314. These limitations, formulated as restrictions "on quantities, rates, and concentrations of chemical, physical, biological, and other constituents," §1362(11), were imposed to achieve national uniformity among categories of sources. See*, e.g., E. I. du Pont de Nemours & Co.* v. *Train*, 430 U. S. 112, 129–130 (1977). The limitations for a given discharge depend on the type of pollutant and source at issue.[2]

Of key importance, new sources must meet stringent "standards of performance" adopted by EPA under §306. That section makes it "unlawful for *any* . . . new source to operate . . . in violation of" an applicable performance

_____

[2] In addition, the Act requires States to institute comprehensive water quality standards for intrastate waters, subject to EPA approval. See §1313. This program supplements the technology-based standards, serving to "prevent water quality from falling below acceptable levels" even when point sources comply with effluent limitations. *EPA* v. *California ex rel. State Water Resources Control Bd.*, 426 U. S. 200, 205, n. 12 (1976).

standard. 33 U. S. C. §1316(e) (emphasis added). In line
with Congress' aim "to insure . . .'maximum feasible con-
trol of new sources,'" *du Pont*, 430 U. S., at 138, the pre-
ferred standard for a new source is one "'permitting *no*
discharge of pollutants,'" *id.*, at 137–138 (quoting 33
U. S. C. §1316(a)(1) (emphasis added)). Moreover, new
sources, unlike existing sources, are not eligible for EPA-
granted variances from applicable limitations. 430 U. S.,
at 138.[3]

In 1982, EPA promulgated new source performance
standards for facilities engaged in mining, including those
using a froth-flotation milling process. See Ore Mining
and Dressing Point Source Category Effluent Limitations
Guidelines and New Source Performance Standards, 47
Fed. Reg. 54598 (1982). Existing mills, the Agency found,
were already achieving zero discharge; it was therefore
practicable, EPA concluded, for new mills to do as well.
*Id.,* at 54602. Accordingly, under 40 CFR §440.104(b)(1),
new mines using the froth-flotation method, as Coeur
Alaska proposes to do, may not discharge wastewater
directly into waters of the United States.

B

The nationwide pollution-control requirements just
described are implemented through the National Pollution
Discharge Elimination System (NPDES), a permitting
scheme set forth in §402 and administered by EPA and the
States. The NPDES is the linchpin of the Act, for it trans-
forms generally applicable effluent limitations into the
individual obligations of each discharger. *EPA* v. *Califor-*

---

[3] Even the provision allowing the President to exempt federal instal-
lations from compliance with the Act's requirements—"if he determines
it to be in the paramount interest of the United States to do so"—does
not extend to new source standards: "[N]o exemption may be granted
from the requirements of section [306] or [307] of this [Act]." 33
U. S. C. §1323(a).

*nia ex rel. State Water Resources Control Bd.*, 426 U. S. 200, 205 (1976). The discharge of a pollutant is generally prohibited unless the source has obtained a NPDES permit. *E.g., EPA* v. *National Crushed Stone Assn.*, 449 U. S. 64, 71 (1980) ("Section 402 authorizes the establishment of the [NPDES], under which every discharger of pollutants is required to obtain a permit.").

The Act also establishes a separate permitting scheme, administered by the Corps, for discharges of "dredged or fill material." 33 U. S. C. §1344(a). Section 404 hews to the Corps' established expertise in matters of navigability and construction. The §404 program does not implement the uniform, technology-based pollution-control standards set out, *inter alia*, in §306. Instead, §404 permits are subject to regulatory guidelines based generally on the impact of a discharge on the receiving environment. See §1344(b); *ante*, at 4–5.

As the above-described statutory background indicates, Coeur Alaska's claim to a §404 permit carries weighty implications. If eligible for that permit, Coeur Alaska can evade the exacting performance standard prescribed by EPA for froth-flotation mills. It may, instead, use Lower Slate Lake "as the settling pond and disposal site for the tailings." App. 360a (Corps' Record of Decision).

## II

Is a pollutant discharge prohibited under §306(e) eligible to receive a §404 permit as a discharge of fill material? All agree on preliminary matters. Only one agency, the Corps or EPA, can issue a permit for the discharge. See *ante*, at 10, 22. Only EPA, through the NPDES program, issues permits that implement §306. See *supra*, at 2. Further, §306(e) and EPA's froth-flotation performance standard, unless inapplicable here, bar Coeur Alaska's proposed discharge. See *ante*, at 14–15.

No part of the statutory scheme, in my view, calls into

question the governance of EPA's performance standard. The text of §306(e) states a clear proscription: "[I]t shall be unlawful for any owner or operator of any new source to operate such source in violation of any standard of performance applicable to such source." 33 U. S. C. §1316(e). Under the standard of performance relevant here, "there shall be no discharge of process wastewater to navigable waters from mills that use the froth-flotation process" for mining gold. 40 CFR §440.104(b)(1). The Act imposes these requirements without qualification.

Section 404, stating that the Corps "may issue permits" for the discharge of "dredged or fill material," does not create an exception to §306(e)'s plain command. 33 U. S. C. §1344(a). Cf. *ante*, at 12. Section 404 neither mentions §306 nor states a contrary requirement. The Act can be home to both provisions, with no words added or omitted, so long as the category of "dredged or fill material" eligible for a §404 permit is read in harmony with §306. Doing so yields a simple rule: Discharges governed by EPA performance standards are subject to EPA's administration and receive permits under the NPDES, not §404.

This reading accords with the Act's structure and objectives. It retains, through the NPDES, uniform application of the Act's core pollution-control requirements, and it respects Congress' special concern for new sources. Leaving pollution-related decisions to EPA, moreover, is consistent with Congress' delegation to that agency of primary responsibility to administer the Act. Most fundamental, adhering to §306(e)'s instruction honors the overriding statutory goal of eliminating water pollution, and Congress' particular rejection of the use of navigable waters as waste disposal sites. See *supra*, at 2–3. See also 33 U. S. C. §1324 (creating "clean lakes" program requiring

States to identify and restore polluted lakes).[4]

The Court's reading, in contrast, strains credulity. A discharge of a pollutant, otherwise prohibited by firm statutory command, becomes lawful if it contains sufficient solid matter to raise the bottom of a water body, transformed into a waste disposal facility. Whole categories of regulated industries can thereby gain immunity from a variety of pollution-control standards. The loophole would swallow not only standards governing mining activities, see 40 CFR pt. 440 (effluent limitations and new source performance standards for ore mining and dressing); *id.*, pt. 434 (coal mining); *id.*, pt. 436 (mineral mining), but also standards for dozens of other categories of regulated point sources, see, *e.g., id.*, pt. 411 (cement

———————

[4] The Court asserts that "numerous difficulties" will ensue if a discharge governed by a new source performance standard is ineligible for a §404 permit. *Ante*, at 12. Namely, the Court notes, the discharger will have to determine whether a performance standard applies to it. *Ante*, at 13. That is not only the usual inquiry under the Clean Water Act; it is one Coeur Alaska answered, without apparent difficulty, when it sought and obtained an EPA permit for the proposed discharge from the lake into a downstream creek. See *ante*, at 6.

JUSTICE BREYER fears that "litera[l] appl[ication]" of performance standards would interfere with efforts "to build a levee or to replace dirt removed from a lake bottom," and thus "may prove unnecessarily strict." *Ante*, at 2 (concurring opinion). His concerns are imaginative, but it is questionable whether they are real. Apple juice processors, meatcutters, cement manufacturers, and pharmaceutical producers do not ordinarily build levees—and it is almost inconceivable that they would do so using the waste generated by their highly specific industrial processes. See, *e.g.,* 40 CFR §411.10 (performance standard for particular cement manufacturing process). Levee construction generally is undertaken by developers or government, entities not subject to performance standards for such a project. This litigation, furthermore, does not illustrate the "difficulty" JUSTICE BREYER perceives. See *ante*, at 1. Coeur Alaska does not seek to build a levee or return dirt to a lake; it simply wants to use Lower Slate Lake as a waste disposal site.

manufacturing); *id.*, pt. 425 (leather tanning and finish-
ing); *id.*, pt. 432 (meat and poultry products processing).
See also Brief for American Rivers et al. as *Amici Curiae*
26–27 (observing that discharges in these categories "typi-
cally contain high volumes of solids"). Providing an escape
hatch for polluters whose discharges contain solid matter,
it bears noting, is particularly perverse; the Act specifi-
cally focuses on solids as harmful pollutants. See 33
U. S. C. §1314(a)(4) (requiring EPA to publish information
regarding "conventional pollutants," including "suspended
solids"); Brief for American Rivers, *supra*, at 28–29, and
n. 18 (identifying over 50 effluent limitations that restrict
total suspended solids).[5]

Congress, we have recognized, does not "alter the fun-
damental details of a regulatory scheme in vague terms or
ancillary provisions—it does not, one might say, hide
elephants in mouseholes." *Whitman* v. *American Trucking
Assns., Inc.*, 531 U. S. 457, 467–468 (2001). Yet an altera-
tion of that kind is just what today's decision imagines.
Congress, as the Court reads the Act, silently upended, in
an ancillary permitting provision, its painstaking pollu-
tion-control scheme. See *ante*, at 17. Congress did so, the
Court holds, notwithstanding the lawmakers' stated effort
"to restore and maintain the chemical, physical, and bio-
logical integrity" of the waters of the United States, 33

_____

[5] The "safeguards" JUSTICE BREYER identifies are hardly reassuring.
See *ante*, at 3 (concurring opinion). Given today's decision, it is opti-
mistic to expect that EPA or the courts will act vigorously to prevent
evasion of performance standards. Nor is EPA's veto power under
§404(c) of the Clean Water Act an adequate substitute for adherence to
§306. That power—exercised only a dozen times over 36 years encom-
passing more than one million permit applications, see Brief for Ameri-
can Rivers 14—hinges on a finding of "unacceptable adverse effect," 33
U. S. C. §1344(c). Destruction of nearly all aquatic life in a pristine
lake apparently does not qualify as "unacceptable." Reliance on ad hoc
vetoes, moreover, undermines Congress' aim to install uniform water-
pollution regulation.

U. S. C. §1251(a); their assignment to EPA of the Herculean task of setting strict effluent limitations for many categories of industrial sources; and their insistence that new sources meet even more ambitious standards, not subject to exception or variance. Would a rational legislature order exacting pollution limits, yet call all bets off if the pollutant, discharged into a lake, will raise the water body's elevation? To say the least, I am persuaded, that is not how Congress intended the Clean Water Act to operate.

In sum, it is neither necessary nor proper to read the statute as allowing mines to bypass EPA's zero-discharge standard by classifying slurry as "fill material." The use of waters of the United States as "settling ponds" for harmful mining waste, the Court of Appeals correctly held, is antithetical to the text, structure, and purpose of the Clean Water Act.

\*    \*    \*

For the reasons stated, I would affirm the judgment of the Ninth Circuit.