# United States Court of Appeals
## For the Eighth Circuit

_____

No. 14-2050
_____

United States of America; State of Nebraska

*Plaintiffs - Appellees*

v.

STABL, Inc., formerly known as Nebraska By-Products, Inc.

*Defendant - Appellant*
_____

Appeal from United States District Court
for the District of Nebraska - Omaha
_____

Submitted: May 13, 2015
Filed: August 27, 2015
_____

Before WOLLMAN, SMITH, and BENTON, Circuit Judges.
_____

WOLLMAN, Circuit Judge.

The United States and the State of Nebraska (collectively, the government) brought an enforcement action against STABL, Inc., formerly Nebraska By-Products, Inc.,[1] for violations of the Clean Water Act and the Nebraska Environmental

_____

[1]Throughout this opinion, we refer to both STABL, Inc. and Nebraska By-Products, Inc. as "STABL."

Protection Act. The district court[2] granted partial summary judgment in favor of the government. Following a bench trial of the remaining issues, the district court imposed a civil penalty in the amount of $2,285,874 and denied STABL's motion for a new trial. We affirm.

## I. Background

Section 402 of the Clean Water Act, 33 U.S.C. § 1342, establishes the National Pollutant Discharge Elimination System (NPDES), a permit program that controls water pollution by regulating sources that discharge pollutants. States may seek authority from the Environmental Protection Agency (EPA) to operate a state permit program. Id. § 1342(b)-(c). States that do so must ensure that industrial users that discharge effluent into wastewater treatment plants comply with pretreatment requirements. See 40 C.F.R. § 403.10. Companies that discharge effluent into water and wastewater treatment plants can be liable for pass-through, which occurs when discharge exits a water or wastewater treatment plant and enters into waters of the United States, causing the plant to violate its NPDES permit, 40 C.F.R. §§ 403.3(p), 403.5(a)(1); for interference, which occurs when discharge inhibits or disrupts a water or wastewater treatment plant, causing the plant to violate its NPDES permit, id. §§ 403.3(k), 403.5(a)(1); or for exceeding the effluent limitations[3] laid out in their pretreatment permits or otherwise failing to meet permit requirements, see 33 U.S.C. §§ 1311(a), 1317(d).

---

[2]The Honorable Laurie Smith Camp, Chief Judge, United States District Court for the District of Nebraska.

[3]Effluent limitations are restrictions on quantities, rates, and concentrations of chemical, physical, biological, and other constituents of wastewater discharges. 33 U.S.C. § 1362(11).

STABL owned and operated a rendering plant that processed dead cattle and offal in Lexington, Nebraska. As part of Nebraska's EPA-approved permit program, the state issued a pretreatment permit to STABL, effective April 1, 2008, that contained effluent limitations for the wastewater that STABL discharged from its facility to the city of Lexington's wastewater treatment plant (treatment plant). The permit contained discharge parameters for ammonia, oil and grease, biochemical oxygen demand,[4] and total suspended solids.[5] These parameters established daily-maximum limitations and weekly-average limitations for measurements of each of the regulated elements. The permit also required STABL to monitor its discharge to the treatment plant in accordance with the foregoing requirements, to maintain records of the monitoring, and to submit discharge monitoring reports (DMRs) reflecting the results. The permit required that STABL perform flow measurements using "appropriate flow measurement devices" that were "installed, calibrated and maintained to insure [sic] . . . the accuracy of the measurements" and that STABL maintain calibration and maintenance records.

The city controlled the valve that allowed wastewater to flow from STABL's facility to the treatment plant. STABL paid the city to perform effluent testing and monitoring and used the city's monitoring records as the basis for the DMRs that it was required to submit to the government. Jason Fagot, STABL's general manager, signed the DMRs and certified under penalty of law that they were prepared "in accordance with a system designed to assure that qualified personnel properly gather[ed] and evaluate[d] the information submitted" and that the "information

---

[4]Biochemical oxygen demand is the amount of oxygen consumed by microorganisms in breaking down organic materials present in wastewater. 5.2 Dissolved Oxygen and Biochemical Oxygen Demand, U.S. Envtl. Protection Agency, http://water.epa.gov/type/rsl/monitoring/vms52.cfm (last updated March 6, 2012).

[5]Total suspended solids are solid pollutants that are suspended, rather than dissolved, in water. Coeur Alaska, Inc. v. Se. Alaska Conservation Council, 557 U.S. 261, 278 (2009).

submitted [was] true, accurate, and complete" to the best of his knowledge and belief. The DMRs reflect numerous "exceedances"—instances when STABL exceeded the limitations set forth in its permit.

In late May 2010, STABL sold its facility to Darling International Inc. (Darling). The purchase price was reduced by $1 million to account for the costs of a pretreatment system needed to bring STABL's facility into compliance.

The government commenced this action in August 2011, alleging, among other things, that beginning in April 2008, measurements of pollutants in and properties of STABL's discharge consistently exceeded its permit limitations; that STABL failed to sample for oil and grease as its permit required; and that beginning in 2006, STABL caused or contributed to problems at the treatment plant, causing the plant to violate its own NPDES permit.[6]

The government moved for summary judgment, offering in support declarations of Mark Klingenstein, an environmental engineer, and Paul Marshall, an EPA compliance officer who focuses on the Clean Water Act pretreatment program. Klingenstein's original declaration contained tables setting forth the number of violations that he believed that STABL had committed, and he submitted a supplemental declaration stating, "I prepared and/or personally verified all of the information in my initial declaration . . . . All tables are accurate and supported by the evidence." The government also attached as exhibits to its motion for summary judgment the DMRs that STABL had been required to submit under the permit program. There was a DMR for each month from April 2008 through May 2010. The DMRs listed for each month the highest daily-maximum and weekly-average

---

[6]The government also alleged that STABL's improper abandonment of wastewater lagoons violated the Nebraska Environmental Protection Act, but the court dismissed this count with the parties' consent.

measurements for each effluent parameter, with the exception of oil and grease during some months. STABL argued that the DMRs were inaccurate and pointed to deposition testimony suggesting that the city's flow meter was not calibrated, that one of the flow meters was rusted off, and that the water was tested on Tuesday, which may not have been an ideal day for testing because the water had been sitting in the tanks for several days. The district court granted the government summary judgment on liability but indicated that it would rule on the number of violations at the penalty phase of the action. The district court later granted the government's motion that the remainder of the proceedings be conducted as a bench trial.

Within the time for expert disclosures, the government had submitted an expert report by Joan Meyer, an economics and financial analyst who gave an opinion regarding the scope of the economic benefits STABL had derived from noncompliance with the effluent limitations in its permit. Subsequently, discovery revealed that STABL and Darling had negotiated the $1 million discount in the sale price of the facility to reflect the facility's lack of compliance with its environmental obligations. Thereafter, approximately eleven weeks before trial and well after the deadline for disclosing expert reports had passed, the government served an updated report by Meyer that included an analysis of the economic benefits of noncompliance to STABL in light of the discount in the sale price of the facility. On September 4, 2013, STABL moved *in limine* to exclude Meyer's testimony and moved in the alternative for a continuance to give it time to submit its own rebuttal expert reports, to depose Meyer, and to schedule a <u>Daubert</u> hearing. A magistrate judge[7] denied STABL's motion, noting that STABL had "waited until two weeks before trial" to move to exclude or for a continuance and that the government had offered STABL the opportunity to depose Meyer after the update. STABL filed a written objection

_____

[7]The Honorable F.A. Gossett, III, United States Magistrate Judge for the District of Nebraska.

-5-

to the magistrate judge's order, which the district court implicitly overruled by ultimately basing its penalty calculation on Meyer's updated analysis.

Over STABL's objections, the government offered at trial the testimony of Klingenstein, Marshall, and Meyer. Marshall's testimony at trial centered around the EPA's inspection of STABL's facility, the investigation of STABL's alleged noncompliance with its effluent obligations, and general background information about the pretreatment permit program. With respect to the allegations of effluent-limitation violations, Marshall testified that his review of the DMRs and monitoring records revealed a total of 1666 daily-equivalent effluent-limitation violations, which was slightly fewer, due to copying or arithmetical errors, than the number the government had proposed at summary judgment. He also testified that STABL did not record its oil and grease levels as required during a sixteen-month period, resulting in 62 to 64 violations for failure to monitor as required under the permit program.

Klingenstein's testimony at trial primarily bore on the rendering process, the process for treating STABL's wastewater, and the effect of STABL's discharge on the treatment plant. He also testified that there were 1666 daily-equivalent effluent-limitation exceedances and that this number included a small downward adjustment from the the number of effluent-limitation exceedances he had counted at the summary-judgment stage. He stated that his original report and declarations were based on Marshall's calculations and that he had only spot-checked the data before submitting his supplemental declaration in support of summary judgment. After noticing an error at a later date, however, he reviewed every single piece of data and uncovered additional errors. Correcting the errors ultimately reduced the total number of effluent-limitation exceedances by three.

The district court determined that STABL's discharges exceeded the requirements of its permits as follows: 76 daily-maximum and 90 weekly-average

exceedances for ammonia; 68 daily-maximum and 76 weekly-average exceedances for biochemical oxygen demand; 42 daily-maximum and 21 weekly-average exceedances for oil and grease; and 10 daily-maximum and 23 weekly-average exceedances for total suspended solids. The district court concluded that this resulted in a total of 196 daily-maximum violations and 1470 "daily violations" from the weekly-average exceedances, calculated by multiplying the 210 total weekly-average exceedances by seven—the number of days in a week. The district court concluded that there were 63 failure-to-monitor violations. It agreed with the government regarding the number of pass-through and interference violations, but disregarded the pass-through and interference violations altogether to avoid "duplicate counting." The district court also reduced the total number of effluent-limitation violations by 196—the number of daily-maximum exceedances—to avoid the potential for double-counting. The district court imposed a penalty of $2,285,874, which equaled twice the economic value that Meyer testified that STABL had derived from noncompliance. The district court stated that it had reached this number because "a civil penalty in an amount twice [STABL's] economic benefit will serve the interests of justice and help to deter others from engaging in similar non-compliance." Following the denial of its motion for a new trial, STABL filed this appeal.

## II. Summary Judgment

STABL challenges the district court's grant of partial summary judgment on liability for the effluent-limitation and failure-to-monitor violations.[8] We review the district court's grant of summary judgment *de novo*. Dahl v. Rice Cty., Minn., 621

---

[8]In its initial brief, STABL challenged several of the district court's rulings related to the pass-through or interference claims. Because the district court did not assess violations for these claims, however, STABL stated at oral argument that it is no longer seeking review of the court's decisions regarding them. The government contends that the district court erred in failing to assess these violations but has not cross-appealed.

F.3d 740, 743 (8th Cir. 2010). We view the facts and inferences derived from those facts in the light most favorable to the nonmoving party. Id. To succeed at summary judgment, the moving party must demonstrate that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The nonmoving party must then come forward with specific facts showing that there is a genuine issue for trial, Dahl, 621 F.3d at 734, either by citing to parts of the record showing that there is a genuine dispute for trial or by demonstrating that the moving party has not established the absence of a genuine dispute or cannot produce admissible evidence supporting the absence of a dispute, see Fed. R. Civ. P. 56(c)(1).

## A. DMRs and Monitoring Records

The Clean Water Act makes it unlawful to operate a polluting source facility in violation of pretreatment standards or a permit's pretreatment requirements. See 33 U.S.C. §§ 1311(a), 1317(d); 40 C.F.R. § 122.41(a). A discharge that exceeds effluent limitations in a permit is "the archetypal Clean Water Act violation, and subjects the discharger to strict liability." United States v. Allegheny Ludlum Corp., 366 F.3d 164, 175 (3d Cir. 2004). "Thus, without more, to violate a[n] NPDES permit is to violate the Act." Chesapeake Bay Found. v. Bethlehem Steel Corp., 608 F. Supp. 440, 451 (D. Md. 1985) (citing EPA v. State Water Res. Control Bd., 426 U.S. 200, 205 (1976)). The Nebraska Environmental Protection Act similarly makes it unlawful to violate a permit condition or limitation. Neb. Rev. Stat. § 81-1508.02(1)(b). As the Clean Water Act was the source of many provisions found in the Nebraska Environmental Protection Act, see State ex rel. Wood v. Fisher Foods, Ltd., 581 N.W.2d 409, 415 (Neb. 1998), and as the parties have not argued that the standards for liability differ under the two acts, we assume that the requirements for liability for violation of a permit limitation or condition under the Nebraska Environmental Protection Act mirror the requirements for liability under the Clean Water Act.

The DMRs and monitoring records were the primary evidence on which the government relied to establish the effluent-limitation violations. If the DMRs were admissible and are sufficiently probative, they demonstrate that STABL exceeded the effluent limitations in its permit. STABL argues that the DMRs and monitoring records were inadmissible and did not constitute a sufficient basis for the district court's grant of partial summary judgment.

Permit holders have a duty to monitor their wastewater discharges, maintain monitoring records, and submit to the government DMRs summarizing the results of that monitoring. 40 C.F.R. §§ 122.41(j), (l)(4), 123.25. Federal regulations require that samples and measurements taken for the purpose of monitoring be representative of the monitored activity and that those submitting DMRs certify that, "[b]ased on [their] inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of [their] knowledge and belief, true, accurate, and complete." 40 C.F.R. §§ 122.22(d), 122.41(j)(1), (k)(1), 123.25. STABL's permit imposed monitoring and certification requirements consistent with these standards.

STABL argues that the DMRs were not admissible because they are hearsay and lack foundation. We disagree. Statements that an opposing party "manifested that it adopted or believed to be true" are not hearsay. See Fed. R. Evid. 801(d)(2)(B). Because the regulations and STABL's permit required STABL to certify their truth and accuracy, the DMRs are nonhearsay adoptive admissions. Moreover, the only foundation required for 801(d)(2)(B) adoptive admissions is a showing that they were made or adopted by the opposing party or by its agent on a matter within the scope of that agency; there is no personal-knowledge requirement. Pillsbury Co. v. Cleaver-Brooks Div. of Aqua-Chem, Inc., 646 F.2d 1216, 1218 n.2 (8th Cir. 1981); see also Mahlandt v. Wild Canid Survival & Research Ctr., Inc., 588 F.2d 626, 630-31 (8th Cir. 1978). STABL failed to respond to the government's requests for admission regarding the authenticity of the DMRs. It thus admitted their

authenticity and that they were what they purported to be: STABL's DMRs, signed by its general manager. See Fed. R. Evid. 901; Quasius v. Schwan Food Co., 596 F.3d 947, 951 (8th Cir. 2010). This was sufficient to establish foundation for the DMRs as 801(d)(2)(B) admissions.

STABL also challenges the reliability of the DMRs. It does not directly dispute that the DMRs reflect effluent-limitation exceedances, but instead argues that the data on which the reports were based was so unreliable that there is a genuine dispute regarding whether STABL's discharges ever exceeded its permit limitations. STABL claims that its DMRs did not accurately record the pollutant levels in its discharge because the flow meters, which measure quantities of water passing through the plant, were rusted off and were not calibrated. STABL also cites deposition testimony by Jess Bliven, the treatment plant superintendent, who stated that the city tested STABL's water on Tuesdays, which "probably wasn't a good day" for testing because the "terrible water" had been sitting for "a couple extra days." The government responds that the DMRs are unassailable admissions and that STABL either cannot impeach its own DMRs or has not presented sufficient evidence to meet its heavy burden of proving laboratory error in its own reports.

When a defendant's own DMRs demonstrate permit exceedances, they constitute sufficient evidence to meet a Clean Water Act plaintiff's burden of production on liability and in some circumstances may be sufficient to entitle the plaintiff to summary judgment.[9] See Allegheny, 366 F.3d at 174; Friends of the Earth v. Eastman Kodak Co., 834 F.2d 295, 298 (2d Cir. 1987). Whether STABL offered

_____

[9]Furthermore, because a permit holder has an obligation to monitor its compliance with its permit and to report the results, we conclude that the absence of reporting for a required parameter in a permit holder's DMRs is sufficient to meet a plaintiff's initial burden of production on liability for failure to monitor. Aside from arguing that the DMRs were inadmissible, STABL has made no persuasive challenge to summary judgment on the failure-to-monitor violations.

sufficient evidence to rebut the effluent-limitation exceedences recorded in its DMRs depends upon the proper amount of weight to accord those reports. The Ninth Circuit has stated that a permit holder may never impeach its own DMRs by claiming laboratory error. Sierra Club v. Union Oil Co. of Cal., 813 F.2d 1480, 1491-92 (9th Cir. 1987), vacated on other grounds, 485 U.S. 931 (1988), reinstated as amended, 853 F.2d 667 (9th Cir. 1988). By contrast, the Third Circuit has held that "[e]vidence that the reports inaccurately overreported the level of discharge are certainly relevant to show that no violation occurred." Allegheny, 366 F.3d at 174.

We agree with the Third Circuit that evidence of overreporting can be relevant to show that there were no violations, but we also agree that a defendant who wishes to assert laboratory error as a defense has a heavy burden. See, e.g., id. at 173-74 (citing Pub. Interest Research Grp. of N.J., Inc. v. Elf Atochem N. Am., Inc., 817 F. Supp. 1164 (D.N.J. 1993)) (finding persuasive the reasoning of a district court that held that a defendant has a "heavy burden" when impeaching its own DMRs); Pub. Interest Research Grp. of N.J. v. Yates Indus., Inc., 757 F. Supp. 438, 447 (D.N.J. 1991) (holding that there is a "heavy burden to establish faulty analysis"). To hold otherwise would give permit holders an incentive to employ lax laboratory techniques. Although it is true that no company that is actually in compliance with its permit obligations would want to employ laboratory techniques that would result in overreporting of pollutant levels, see Allegheny, 366 F.3d at 175, a company that wished to circumvent its effluent-limitation obligations could simply ensure that its laboratory results were impeachable. Furthermore, Congress imposed the monitoring and reporting requirements in part to "avoid the necessity of lengthy fact finding, investigations, and negotiations at the time of enforcement." S. Rep. No. 92-414, at 64 (1972). Allowing a permit holder to impeach its own DMRs simply by pointing to potential laboratory error, without specific evidence demonstrating that the laboratory error likely resulted in overreporting of pollutant levels that were in fact within permit limitations, would subvert Congress's purpose in enacting the monitoring and reporting requirements.

To impeach its own DMRs, a party must, at the very least, offer evidence that corroborates its claim that the pollutant levels were overreported and were actually within permit limitations. Cf. Elf Atochem, 817 F. Supp. at 1178 (allowing the defendant's claims of laboratory error to defeat summary judgment when parallel testing by another laboratory produced results within permit limitations); Allegheny, 366 F.3d at 173-74 (discussing Elf Atochem). Evidence of unreliable testing methods alone is insufficient. STABL has offered no evidence demonstrating that the correct measurements would in fact have fallen within its permit limitations, nor has it offered evidence demonstrating that the supposedly uncalibrated or faulty flow meter was more likely to result in overreporting than underreporting. STABL's claim of overreporting is thus nothing more than sheer speculation. Furthermore, Bliven's statement that Tuesday was not a good day for sampling does not undermine the probative value of the DMRs, because it was STABL's obligation to ensure that the effluent samples used for measurements were representative of the activities it was monitoring. In sum, STABL did not offer sufficient evidence to impeach its own DMRs, and the DMRs were sufficient evidence of liability to grant summary judgment on at least some effluent-limitation violations.

## B. Klingenstein's Declarations

STABL argues that the district court erred by considering Klingenstein's declarations regarding the effluent-limitation violations. Although Klingenstein did opine that, based on the DMRs, STABL's discharges exceeded the limitations in its permit, his declarations were not necessary to establish those violations. The DMRs, which were not sufficiently impeached, themselves established liability for at least some of the effluent-limitation violations by way of a simple comparison of the reported data with STABL's permit. STABL argues that the DMRs are indecipherable without Klingenstein's explanatory declarations. We disagree. Even if the underlying monitoring records containing the sampling data required explanation, STABL's actual DMRs are legible, and the meaning of the data reported

-12-

therein is straightforward. Thus, the district court's consideration of Klingenstein's declarations constituted harmless error, if error at all. See Winter v. Novartis Pharm. Corp., 739 F.3d 405, 411 (8th Cir. 2014) (holding that considering inadmissible evidence is harmless error when that evidence is cumulative of other, admissible evidence).

### III. Post-Summary Judgment and Trial

STABL challenges several of the district court's decisions to allow certain evidence to be presented at the bench trial. STABL also asserts that Klingenstein's supposed misrepresentations should result in dismissal or remand of this case. Finally, STABL claims that the district court deprived it of its right to a jury trial under the Seventh Amendment by conducting a bench trial to determine the number of STABL's violations.

### A. Marshall's Testimony

STABL argues that Marshall, an EPA compliance officer and one of the government's witnesses at the bench trial, was not disclosed or qualified as an expert witness, yet offered an opinion based on "scientific, technical, or other specialized knowledge" in contravention of Federal Rule of Evidence 701. The government argues that Marshall was properly characterized as a lay witness.

We review the district court's decision to admit Marshall's testimony for abuse of discretion. See US Salt, Inc. v. Broken Arrow, Inc., 563 F.3d 687, 689-90 (8th Cir. 2009). Determining whether a witness is offering an expert or lay opinion requires a case-by-case analysis of both the witness and the witness's opinion. United States v. Smith, 591 F.3d 974, 982-83 (8th Cir. 2010) (citing In re Air Crash at Little Rock Ark. on June 1, 1999, 291 F.3d 503, 515-16 (8th Cir. 2002)). Although lay witnesses may not testify about scientific knowledge within the scope of Federal Rule of

Evidence 702, "[p]erceptions based on *industry experience* [are] a sufficient foundation for lay opinion testimony." Id. (second alteration in original) (quoting US Salt, Inc., 563 F.3d at 690).

Although Marshall testified on a number of subjects, a substantial portion of his testimony offered background information that was irrelevant to the district court's determination of the number of effluent-limitation and failure-to-monitor violations. The number of violations could be determined by a review and comparison of STABL's DMRs, its permit limitations and obligations, and the city's sampling data contained in the monitoring records. Marshall's relevant testimony established that, although STABL's discharge was tested weekly, the monthly DMRs reflected the highest daily-maximum and highest weekly-average readings from each month. He further testified that one must therefore review the city's sampling data to determine the additional number of effluent-limitation violations in any month in which the DMRs reflected one or more exceedances of the daily-maximum or weekly-average limits for any parameter. Marshall then testified as to the number of violations he counted in the city's monitoring records and the number of weeks for which oil and grease monitoring results were missing from the records. In addition, Marshall testified regarding the EPA's investigation of STABL and the treatment plant. This testimony may properly be viewed as primarily related to Marshall's industry experience as an EPA compliance officer rather than expert knowledge. Furthermore, mere tabulation does not require scientific, technical, or other specialized knowledge. Accordingly, the district court did not abuse its discretion in admitting Marshall's testimony as lay testimony under Federal Rule of Evidence 701.

B. Meyer's Economic-Benefit Opinion

STABL argues that the district court erred in considering Meyer's testimony and updated expert report and in denying its motion *in limine* and request for a continuance.

A party must disclose expert opinions "at the times and in the sequence that the court orders." Fed. R. Civ. P. 26(a)(2)(D). Under Rule 26(e), a party has a duty to supplement disclosed information "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect." Fed. R. Civ. P. 26(e)(1)(A). A party who fails to provide information as required by Rule 26(a) or (e), or fails to do so in a timely manner, may not use that information or witness unless its failure to comply with the Rule is harmless or substantially justified. Fed. R. Civ. P. 37(c)(1); see Trost v. Trek Bicycle Corp., 162 F.3d 1004, 1008 (8th Cir. 1998) ("[F]ailure to disclose in a timely manner is equivalent to failure to disclose . . . ."). We review for abuse of discretion a district court's decision not to exclude expert testimony under Rule 37(c)(1). Primrose Operating Co. v. Nat'l Am. Ins. Co., 382 F.3d 546, 563 (5th Cir. 2004). We review a district court's 26(e) ruling for gross abuse of discretion and reverse only if it resulted in fundamental unfairness. Kahle v. Leonard, 563 F.3d 736, 740 (8th Cir. 2009). We review the district court's denial of a motion for continuance for abuse of discretion. Farmers Co-Op Co. v. Senske & Son Transfer Co., 572 F.3d 492, 499 (8th Cir. 2009).

In April 2012, the government disclosed Meyer's original expert report analyzing the economic benefit that STABL derived from noncompliance with its permit obligations. In May 2012, the government deposed Leon Johnson, who testified that he accepted a $1 million reduction in the sale price of STABL, Inc. based on the costs Darling would incur to take on the pretreatment project. In November 2012, STABL disclosed financial records reflecting this sale-price reduction. On July 2, 2013—eleven weeks before the anticipated September 17, 2013, trial date—the government served Meyer's "Updated Report" on STABL, using the $1 million sale-price reduction to propose an alternative calculation of the economic benefits of noncompliance.

In her original report, Meyer used a "discounted cash flow model" to estimate the financial benefit STABL derived from noncompliance with its permit. Because

-15-

she had no information regarding how STABL and Darling had addressed compliance costs when negotiating the sale price of the facility, she assumed that STABL derived economic benefits from delaying the costs of compliance and that, in some form, STABL had eventually incurred the cost of building a wastewater treatment system. In her updated report, Meyer took into account the fact that STABL had negotiated a specific discount in the facility's sale price that reflected the facility's noncompliance with pretreatment obligations. She determined that this would increase STABL's economic benefit because it meant that STABL did not merely delay the construction and one-time costs of building a treatment system, but rather avoided those costs altogether in exchange for $1 million. Meyer opined that the actual million-dollar price reduction could be substituted for the estimated delayed costs used in her original report, and that "[t]his alternative scenario more precisely models the financial impacts of noncompliance actually realized by STABL." Meyer also updated her report to adjust for the passage of time, to include company-specific financial information provided by STABL, and to remove the construction-cost contingency from estimates of treatment equipment costs.

STABL argues that Meyer's "Updated Report" included a materially altered opinion and was untimely. But the report itself suggests that in her revised analysis, Meyer simply changed the assumptions in her original report based on the new information she had received. Johnson's deposition, and STABL's subsequent production of financial documents, occurred after Meyer's original expert disclosure. Since Johnson revealed information that altered Meyer's expert analysis and rendered her original opinion incomplete, the government was obligated under Rule 26(e) to provide an updated expert report based on that information. It would have taken time for Meyer to prepare her updated analysis and make the additional revisions to her report.

Furthermore, even if Meyer's updated report was untimely, the district court did not abuse its discretion in determining that the delay was harmless and that

-16-

STABL was not entitled to a continuance. STABL never disclosed its own expert to rebut Meyer's original opinion and methodology—a methodology that was not fundamentally altered in the updated report. Even if the government delayed in submitting the updates, STABL also delayed by waiting more than nine weeks after receiving the updated expert opinion and until about two weeks before trial to move to exclude Meyer's testimony or for a continuance. The district court could have properly concluded that the updated numbers in Meyer's report did not prejudice STABL and that STABL's motion was itself an attempt to delay or to insert new experts into the litigation on the eve of trial. The cases STABL cites—Wegener v. Johnson, 527 F.3d 687, 690 (8th Cir. 2008); White v. Howmedica, Inc., 490 F.3d 1014, 1016 (8th Cir. 2007); and Trost v. Trek Bicycle Corp., 162 F.3d 1004, 1008 (8th Cir. 1998)—all involved instances in which we affirmed a district court's discretionary decision to exclude untimely expert testimony. They do not establish that a district court abuses its discretion by permitting untimely updates to expert reports, and thus we conclude that the district court did not abuse its discretion by determining that any delay in updating the report was harmless, by allowing Meyer's testimony based on the updated report, and by denying STABL's request for a continuance.

## C. Klingenstein's Corrected Calculation of Total Violations

STABL argues that because Klingenstein verified the accuracy of his original declaration in support of summary judgment, but later found errors because of mistakes made by Marshall, the government should be estopped from using his expert testimony or the case should be dismissed or remanded for a new trial. STABL's argument is without merit. At the time of his original expert declaration at summary judgment, Klingenstein was simply relying on Marshall and on the EPA's work to form his opinion. When Klingenstein corrected the data, he disclosed the changes soon thereafter at trial, and the corrections actually favored STABL, resulting in three fewer violations. STABL has not shown there was "affirmative misconduct," as

required to establish estoppel against the government. See Bartlett v. U.S. Dep't of Agric., 716 F.3d 464, 475-76 (8th Cir. 2013).

## D. Monitoring Records

STABL challenges the reliability and admissibility of the city's monitoring records, which contained the sampling data on which the DMRs were based. Even if the government had not established sufficient foundation for the monitoring records at summary judgment, it had done so by the end of trial. Although STABL did not create the monitoring records, it admitted their authenticity. Fagot testified at trial that STABL used the monitoring records to prepare its DMRs, and he certified on the DMRs that the reports were "prepared . . . in accordance with a system designed to assure that qualified personnel properly gather[ed] and evaluate[d] the information submitted." Fagot also certified that, based on his inquiry of the persons who managed the system or were responsible for gathering the information, the information in the DMRs was "true, accurate, and complete" to the best of his knowledge and belief. The certification on the DMRs thus served as a manifestation of STABL's belief that the underlying monitoring records were accurate. The monitoring records, like the DMRs, were therefore admissible as adoptive admissions. See Fed. R. Evid. 801(d)(2)(B). Furthermore, STABL's permit, as well as federal regulations, 40 C.F.R. §§ 122.41(j)(1), 123.25, required that the samples and measurements used to create the requisite monitoring records be representative of the discharge, and the permit required that monitoring utilize flow measurement devices that are consistent with accepted scientific practices and "installed, calibrated and maintained to insure that [sic] the accuracy of the measurements." Because STABL had an obligation to ensure that the sampling data in the monitoring records, on which the DMRs were based, was accurate and representative of its discharge activities, its attempt to impeach the monitoring records fails for the same reason as its attempt to impeach the DMRs.

## E. STABL's Right to a Jury Trial

In its memorandum and order granting partial summary judgment, the district court stated, "The issue of the total number of violations committed . . . is intertwined with the issue of the appropriate penalties the Court may award pursuant to 33 U.S.C. § 1319(d). Therefore, at this time, the Court will not rule on the exact number of violations committed." The district court instead ruled on the number of violations at the conclusion of the bench trial.

Whether a party has a right to trial by jury is a question of law that we review *de novo*. Smith Flooring, Inc. v. Pa. Lumbermens Mut. Ins. Co., 713 F.3d 933, 936 (8th Cir. 2013). In a Clean Water Act suit, the defendant is entitled to a jury trial on issues of liability but is not entitled to have a jury determine the amount of the penalty. See Tull v. United States, 481 U.S. 412, 425-27 (1987).

STABL argues, and the government does not dispute, that the total number of Clean Water Act violations is an issue of liability that falls within a defendant's Seventh Amendment right to a jury trial. We therefore assume that the parties are correct. Cf. U.S. E.P.A. v. City of Green Forest, 921 F.2d 1394, 1406-07 (8th Cir. 1990) (approving jury determination of the number of violations, but noting district court committed harmless error in failing to instruct on the correct method of calculation). We also assume for purposes of this appeal that STABL has preserved its argument on this issue, even though it did not raise this specific argument below in opposition to the government's motion for a bench trial. The government argues that to determine the number of violations, the district court relied principally on the DMRs and underlying monitoring data from April 2008 to May 2010, and therefore judgment as a matter of law on the number of violations was appropriate.

"The erroneous denial of a jury trial in a civil case is subject to harmless error analysis." Ind. Lumbermens Mut. Ins. Co. v. Timberland Pallet & Lumber Co., 195

F.3d 368, 375 (8th Cir. 1999) (quoting Fuller v. City of Oakland, 47 F.3d 1522, 1533 (9th Cir. 1995)).  We will affirm if the evidence offered at the bench trial would have allowed the court to grant judgment as a matter of law on the number of violations. See Fuller, 47 F.3d at 1533 (noting that the standard for harmless-error review of the denial of a jury trial is whether the court could have granted judgment as a matter of law).[10]

Although the district court did not allow the parties to present any evidence on "liability" at the bench trial, the court made it clear that a primary purpose of the bench trial was to determine the number of violations, and the parties had every opportunity to present evidence on that issue.  STABL challenged the court's consideration of Marshall's and Klingenstein's testimony and the reliability and admissibility of the DMRs and monitoring records, but STABL neither disputed the final number of violations reflected in the DMRs and monitoring records nor offered an alternative methodology for calculating the number of violations.  Nor does STABL on appeal point to any actual errors in the tabulation of the number of

---

[10]The government contends that the district court's ruling on the number of violations was in fact a reserved ruling on summary judgment.  Whether we characterize the district court's ruling on the number of violations as a reserved ruling on, or reconsideration of, summary judgment, or as a finding following a bench trial subject to harmless-error analysis, our review is essentially the same.  See Tatum v. City of Berkeley, 408 F.3d 543, 549 (8th Cir. 2005) (recognizing that the court applies an identical legal standard in deciding a motion for summary judgment and a motion for judgment as a matter of law); see also Macquarie Bank Ltd. v. Knickel, Nos. 14-1683, 14-1684, slip op. at 14, 2015 WL 4385677, at *7 (8th Cir. July 17, 2015) (noting that a district court is free to reconsider its ruling denying summary judgment); Conkling v. Turner, 18 F.3d 1285, 1296 (5th Cir. 1994) (concluding that after trial, a district court may *sua sponte* reconsider partial denials of summary judgment); Warner Bros. Inc. v. Am. Broad. Cos., Inc., 720 F.2d 231, 245-46 (2d Cir. 1983) (holding that a trial court has discretion to reconsider, *sua sponte*, a denial of summary judgment when the non-moving party had a full opportunity to oppose the original motion and the court considered all of the party's proposed evidence).

violations reflected in the DMRs and monitoring records. Instead, STABL simply asserts that there was a genuine dispute over the number of effluent-limitation violations, entitling it to try the issue before a jury. This is insufficient to demonstrate a factual dispute. Because STABL's challenges to the witness testimony and the admissibility of the DMRs and monitoring records fail, and because STABL has not sufficiently impeached the DMRs and monitoring records, the evidence would have allowed the district court to grant judgment as a matter of law on the number of effluent-limitation violations. Any error in denying a jury trial was harmless.

## IV. Other Arguments

STABL asserts a number of additional arguments in its brief. Having considered them, we conclude that they either are meritless or relate solely to the district court's rulings on the pass-through and interference claims, which are no longer the subject of review.

## V. Conclusion

The district court's evidentiary rulings and grant of partial summary judgment were not in error or were harmless error. The district court's reservation or reconsideration of summary judgment after trial was proper, or, in the alternative, its decision to hold a bench trial on the number of Clean Water Act violations was harmless error. The orders and the judgment are affirmed.

_____